UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADP, LLC,<br><br>                    **Plaintiff,**<br><br>v.<br><br>**DAVID TRUEIRA,**<br><br>                    **Defendant.** | Civ. No. 18-3666<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

Before the Court is a motion for a temporary restraining order and a preliminary injunction (ECF no. 3) brought on by order to show cause filed by the plaintiff, ADP, LLC ("ADP"). The defendant, David Trueira, left his employment at ADP and joined a rival firm, Ultimate Software Group, Inc. ("Ultimate"). To simplify a bit, ADP asks this Court to enjoin its former employee, for a period of one year, from providing services for Ultimate in the same geographic territory he covered for ADP, and from soliciting business from any client of ADP or encouraging any clients to cease doing business with ADP.  The Complaint asserts causes of action for breach of contract, breach of duty of loyalty, and unfair competition.[1]

On March 16, 2018, I denied ADP's request for a temporary restraining order but ordered expedited discovery and scheduled the matter for a hearing on the preliminary injunction application. On April 18, 2018, I held an evidentiary hearing. The court heard live testimony from two witnesses: David

---

[1]     This Court exercises jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the alleged amount in controversy exceeds $75,000.

Trueira, who testified on his own behalf, and Kate Whittier, the Vice President of Sales for Major Account Services for ADP and Trueira's former supervisor, who testified on behalf of ADP. I accepted certifications and declarations from witnesses in lieu of direct testimony. Trueira and Whittier were cross-examined and also gave redirect testimony. The parties submitted documentary exhibits, as well as deposition transcripts. After the hearing, the parties submitted proposed findings of fact and conclusions of law.

For the reasons set forth below, the Court is persuaded that ADP has met its burden of showing that injunctive relief is warranted with respect to the Sales Representative Agreement and the Non-Disclosure Agreement, but not the Restrictive Covenant Agreements. ADP's motion for a preliminary injunction is therefore granted in part and denied in part.

I.      **Findings of Fact**

**Introduction**

In the course of the hearing. I had the opportunity to observe the demeanor of the witnesses and assess their credibility. In doing so, I considered such usual factors as the witnesses' apparent ability to recall; their general affect and demeanor; the apparent influence of bias or interest in shaping the narrative; the inherent plausibility of the accounts; and the extent to which their testimony fit with other evidence. I kept in mind that discovery, to date, has necessarily been limited. I have accepted the bulk of both sides' factual contentions. Ms. Whittier's testimony, to be sure, had a pro-plaintiff slant. I had more difficulty, however, with the credibility of Mr. Trueira, who sometimes was evasive (employing such qualifications as "vaguely") and sometimes selective in what he remembered reading. The most stark factual disputes, however, concerned the Restrictive Covenant Agreements, which I have found unenforceable, and not the Sales Representative Agreement or the Non-Disclosure Agreement.

A. **Trueira's Employment before working at ADP**

1.  Prior to working at ADP, Trueira had been working as a sales person in business marketing and advertising for about 7 years. (Trueira Cert. ¶ 19.)

2

*See* (Tr. 50:19-:22.) He had never before worked in the areas of payroll and human capital management. (*Id.* at 50:14-:17.)

2.  All of Trueira's knowledge, training, and experience in the area of payroll and human capital management began with ADP. (*Id.* at 50:25-51:2.)

**B. ADP's Business**

3.  ADP is a Delaware limited liability company with its principal place of business in Roseland, New Jersey. (Compl. ¶ 2.)

4.  It is a provider of "business outsourcing and software services to clients, including human resources, payroll, tax, and benefits administration services." (*Id.* at ¶ 6.)

5.  ADP offers its services internationally and across the United States, including in New Jersey. (*Id.*)

**C. Trueira's Employment with ADP**

6.  On August 6, 2012, Trueira began employment with ADP in its Salem, New Hampshire Office. (Trueira Cert. ¶ 2.) On February 9, 2018, he resigned from ADP and immediately began his employment with Ultimate. (*Id.* at ¶¶ 42, 45.)

**i.      Employment in ADP's Total Source Division**

7.  At the beginning of his employment with ADP, Trueira sold ADP's Total Source products and services.[2] (*Id.* at ¶ 4.)

---

[2]      In his Certification, Trueira generally describes his initial Total Source position as a "sales associate" position or "salesperson." (Trueira Cert. ¶¶ 2, 6, 7.) His subsequent position in Total Source was as a "Sales Executive." (*Id.* at 8.) At the hearing, he specified that the positions he held while at Total Source were: "Total Source district manager; Total Source senior district manager; Total Source sales executive." (Tr. 29:1-:2.)

Kate Whittier, the Vice President of Sales in ADP's Major Accounts Sales Division who supervised Trueira during the last 8 months of his employment, describes Trueira's initial role as a "District Manager I" position. (Whittier Decl. ¶¶ 2, 3; Whittier Suppl. Decl. ¶ 2.) According to Whittier, Trueira was subsequently promoted to District Manager on or about May 20, 2013. (*Id.* at ¶ 3). Moreover, on or about June 30, 2014, Trueira "was promoted to Total-Source Senior District Manager," and on or about June 29, 2015, Trueira "was promoted to Sales Executive" in Total Source. (*Id.*) *See* (Compl. ¶ 9) (providing the same information).

3

8. Total Source is a professional employer organization program through which ADP would provide human resource services, employee benefits administration, and payroll services to employers. (*Id.*) Through outsourcing, ADP would step into the role of co-employer of each client's personnel for the purposes of payroll, employee benefits, and other aspects of employee management. (*Id.*) *See* (Tr. 28:13-:17, 57:20-:25.)

9. When selling Total Source products and services, Trueira focused on employers of 25 to 75 employees. (Trueira Cert. ¶ 5.)

10. Trueira recalls that he "rarely proposed and never sold Total Source products and services to employers with 200 or more employees." (*Id.*)

11. Approximately 70% of Trueira's business (solicitation and sales) was with already-existing ADP clients. (*Id.* at ¶ 6). The remaining 30% of his business was with new ADP clients. (*Id.*)

12. Trueira solicited clients in two counties in northern Massachusetts and certain areas of Boston. (*Id.* at ¶ 7).

13. During Trueira's time as a Total Source sales associate, ADP assigned him an electronic database. (*Id.*) Known as the "SalesForce database," the database contained client and prospective client information, including a client's name, contact information, number of employees, and telephone numbers. (Tr. 32:16-33:6.)

14. The SalesForce database identified approximately 200 prospective clients for Trueira. (Trueira Cert. ¶ 7.) Trueira was also referred leads by sales associates in ADP's Small Business Division and Major Accounts Division. (*Id.*)

15. In late June/early July 2015, about 3 years after Trueira began employment with ADP as a sales associate, he was promoted to a Sales Executive position in ADP's Total Source Division. (*Id.* at ¶¶ 4, 8.; Whittier Decl. ¶ 3.)

16. For about 2 years, Trueira managed a team of approximately 6 sales associates who sold Total Source products and services to ADP clients and

prospective clients in northern Massachusetts and New Hampshire.
(Trueira Cert. ¶ 8.)

17.     In this period, Trueira's team "rarely made a proposal and never sold
        Total Source products and services to any employer having 200 or more
        employees." (*Id.* at ¶ 9.)

### ii.     Employment in ADP's Comprehensive Services Division

18.     In late June/early July 2017, Trueira transferred to a Sales position in
        ADP's Comprehensive Services Division.[3] (*Id.* at ¶ 10.) Trueira was in that
        position for approximately 7 months before he left ADP. (*Id.*)

19.     Trueira's supervisor during his time in Comprehensive Services was Kate
        Whittier. (Tr. 29:17-:19.)

20.     As a Comprehensive Services Manager, Trueira was considered an
        "overlay" sales representative who worked with District Managers who sold
        Workforce Now. (Trueira Cert. ¶ 13; Tr. 29:13-:16.)

21.     ADP's Workforce Now is a technology platform for software that provides
        basic payroll and tax services. (Tr. 29:20-:24.) Individual modules can be
        added to that platform, including modules for applicant tracking,
        performance management, analytics, document storage, human resources,
        and time and attendance. (*Id.* at 29:5–30:18.) Each module is an add-on to
        the basic Workforce Now product. (*Id.* at 74:12-:14.)

22.     Trueira never sold ADP's Workforce Now product and services. (Trueira
        Cert. ¶ 17. *See* Tr. 62:11-:12.)[4]

23.     ADP's Comprehensive Services division sells such individual modules
        and services that function on the WorkForce Now platform.[5] (*Id.* at 30:23–

---

[3]     The parties dispute whether this was a promotion. I make no finding. *See*
Whittier Decl. ¶ 3; Trueira Cert. ¶ 10).

[4]     When asked if Trueira ever attempted to sell Workforce Now, Whittier responded
"not to my knowledge." (Tr. at 88:21-:23.)

[5]     As Whittier describes the two, ADP's WorkForce Now product is a software
platform that clients

31:10). Such services were sold individually, not as a bundled package. (Trueira Cert. ¶ 11.)

24.   Comprehensive Services therefore required ADP's Workforce Now as a platform. (Tr. at 30:19-22, 31:7-:9; *id.* at 59:8-11.)

25.   Total Source, however, does not require Workforce Now as a platform. (*Id.* at 59:5-:7.)

26.   Comprehensive Services is similar to Total Source, but lacks the professional employer organization feature. (Trueira Cert. ¶ 11. *See* Tr. 58:18-:24 (describing Comprehensive Services as "people support" without the professional employee organization structure.)

27.   Comprehensive Services is an outsourcing by the client/employer of payroll processing and other services. (Trueira Cert. ¶ 11. *See* Tr. 29:3-:7, 58:15-59:4. *See also* Whittier Decl. ¶ 3) (describing Comprehensive Services as "business process outsourcing services").) ADP would not, however, become a co-employer, as it did with Total Source. (Trueira Cert. ¶ 11.)

28.   A Comprehensive Services client would be assigned a "dedicated person" from ADP to assist it in a certain area or areas. (Tr. 29:8-:11.)

29.   After Trueira sold clients Comprehensive Services products, he did not remain responsible for managing clients. ADP would "routinely assign a Relationship Manager with whom the client would deal concerning the Comprehensive Services provided to it." (Trueira Cert. ¶ 12.)

30.   Trueira would, however, interact with Comprehensives Services clients when they would request assistance with implementation issues. (*Id.*)

31.   From July 2017 to December 2017, Trueira worked with four District Managers, and from January 2018 to early February 2018, he worked with two District Managers. (*Id.* at ¶ 13.)

---

purchase to manage payroll, benefits, time and attendance, etc. ADP's Comprehensive Services are an additional service offered, which provide clients consulting services in such areas as payroll, employee benefits, human resources, etc.

(Whittier Suppl. Decl. ¶ 7.)

32.   Trueira would solicit business from the clients to which he was directed by the District Managers. (*Id.* at ¶ 14; Tr. 32:4-:8.)

33.   Trueira was not directly assigned a specific geographic territory. (Trueira Cert. ¶ 16.) Rather, his territory was the territory of the District Managers for whom he served as an overlay. (*Id.* at ¶¶ 15-16.)

34.   The four District Managers with whom Trueira initially worked sold Workforce Now in Northern Massachusetts, New Hampshire, Maine, and the greater Boston area. (*Id.* at ¶ 16. *See* Whittier Decl. ¶ 3.)

35.   While working with those District Managers, Trueira sold Comprehensive Services to two existing ADP clients in New Hampshire. (Trueira Cert. ¶¶ 15, 16.)

36.   Trueira did not make any sales of Comprehensive Sources while working with the two District Managers in January and February 2018. (*Id.* at ¶ 13.)

37.   As a Comprehensive Services Manager, Trueira met with approximately 50 clients. (*Id.* at ¶ 15.) The ADP clients and prospective clients that Trueira solicited were in Northern Massachusetts, New Hampshire, Maine, and the greater Boston area. (*Id.*)

38.   More than 80% of the companies with whom he met were existing ADP clients. (*Id.*)

39.   During the sales process for Workforce Now or Comprehensive Services, District Managers provide demonstrations of the products and sometimes provide documents with product information. (Tr. 105:17-106:1). However, ADP does not require the potential client to sign a confidentiality agreement regarding the documents, demonstration, or pricing information. (*Id.* at 106:2-:17.)

40.   After a company signs onto ADP and becomes a client, it is provided a sales order which incorporates a Master Service Agreement. (*Id.* at 120:15-:17, 123:6-:10.) That Master Service Agreement includes a section guarding ADP's confidential and proprietary information. (*Id.* at 118:18-119:17.)

### a) Salesforce Database

41. Trueira did not have a Salesforce database of prospective clients assigned directly to him. (Trueira Cert. ¶ 14.)

42. Trueira did have access to the Salesforce database (or client list) of each of the District Managers for whom he acted as an overlay. (*Id.* at ¶ 38.) *See* (Tr. 32:19, 39:9-:10, 65:3-:4, 93:7-:10.)

43. Trueira would access these databases, generally to make a note about a meeting or discussion with a client. (Trueira Cert. ¶ 38.)

44. Trueira did not have access to any type of database identifying all of ADP's clients worldwide or all of ADP's clients nationwide in one document. (Tr. 93:15-:21.)

45. Trueira did not have his own access to a database that identified all of ADP's clients in a specific state, but did have access to the state-specific information in his District Managers' databases. (*Id.* at 93:22-94:10.)

46. Trueira sat in on feedback and roundtable discussions that were open to all of Comprehensive Services' District Managers. (*Id.* at 111:10-:17.)

### b) Pipeline

47. During his time at Comprehensive Services, Trueira created a "pipeline," an Excel spreadsheet that tracked and documented potential sales of Comprehensive Services. (*Id.* at 33:7-:10, 38:1-:3. *See* Whittier Suppl. Decl., Exh. 1.)

48. The pipeline "show[ed] what potential business may or may not be coming in." (Tr. at 33:17-:18.)

49. The information in the pipeline was a combination of information from the District Managers and information from Trueira. (*Id.* at 34:22-35:1.)

50. Trueira provided the pipeline to his supervisor, Whittier, on a weekly or biweekly basis. (*Id.* at 33:10-:11).

51. The pipeline included the following information: company name, location, contact person, the title of the contact person, "roll call," employee count, product information, information on the stage of the sales process, who

referred the company, and whether the company is a prospect or a client. (*Id.* at 35:2-:14; 36:5-:10, :21-37:12).

52.   The "Roll call" column referred to the potential revenue that Trueira expected to generate from that particular client. (*Id.* at 35:15-36:4.)

53.   The pipeline distinguished between "a pure prospect of ADP Major Accounts or . . . a client of ADP Major Accounts." (*Id.* at 36:12-:14. *See* Trueira Dep. 66:6-:14) (explaining that the list includes ADP clients that Trueira considers to be a prospect for Comprehensive Services, and prospects that may be candidates for Comprehensive Services that are not existing ADP clients).)

54.   All of the companies identified as existing ADP clients on the last pipeline Trueira prepared were already on Workforce Now. (Tr. at 36:19-:20, 61:10-:20.)

55.   Two companies listed in the pipeline were identified not as existing ADP clients but as "prospects." (*Id.* at 61:13-:15, :25-62:3.) One prospect company was not an ADP client. The other was an ADP Total Source client, but not a Workforce Now client. (*Id.* at 62:4-:10.)

56.   The "product" column identified the particular product that Trueira and the District Manager thought they could sell to the client or prospect. (*Id.* at 36:21-37:1.)

57.   The "product" column listings did not include WorkForce Now. (*Id.* at 92:19-:23.)

58.   The "stages" column identified the stage of the sales process, and the "referred by" column identified the District Manager that Trueira was working with. (*Id.* at 37:2-:7.)

59.   The pipeline also included a "month" column which was an estimate of when the business would come in for ADP, assuming ADP "won the business." (*Id.* at 37:15-:18.)

60.   The final column of the pipeline, "notes," contained information on the next steps that were going to be taken and where Trueira and the District Manager "were in the process." (*Id.* at 37:19-:25.)

61.   The top portion of the pipeline identified companies that Trueira was actively soliciting. (*Id.* at 86:7-:11.)

62.   The bottom portion of the pipeline identified "leads," which were companies that Trueira and the District Manager considered to be potential clients. (*Id.* at 38:11-:12.)

63.   Companies would appear on the "leads" list either because a meeting had been held with that company or because someone at ADP had recommended going after that account. (*Id.* at 60:17-:21.)

**D. Trueira's Training while at ADP**

64.   When Trueira began working in ADP's Total Source Division, he received formal and informal new-hire training in the Total Source product. (Tr. 58:2-:11. *See* Trueira Cert ¶ 19.) The formal training consisted of classes, while the informal training consisted of Trueira's shadowing other employees who were selling Total Source. (Tr. 58:2-:11.)

65.   In the Total Source Division, Trueira also had "several trainings," including a leadership development training in 2014 which was given by Total Source group. (*Id.* at 58:12-:14, 78:18-79:5.)

66.   Through Blackboard integration, a training site that ADP uses, Trueira attended 13 or 14 different courses while he was selling Total Source. (*Id.* at 79:9-:18.)

67.   Every time that Trueira's role at ADP changed, he would receive training specific to the new products and services he was dealing with. (Trueira Cert ¶ 19.)

68.   When Trueira began to work in the Comprehensive Services Division, he did not receive any formal training. (Tr. 59:12-:14.) He recalled receiving informal training by watching videos and observing demonstrations. (*Id.* at 59:15-:18.)

69.   Whittier testified credibly that Trueira did have formal training "in certain aspects" of Comprehensive Services. (*Id.* at 82:11-:13.) She explained that she had instructed Trueira to participate in a series of trainings that the Vice President of Computer Services had set up. (*Id.* at 82:4-:10.)

70.   She also testified credibly that Trueira had formal training in executive conversations, "a training on gaining access at the C level and how a CFO thinks and how to be effective at basically getting them to meet with you and what was on top of their mind." (*Id.* at 82:18-:20.)

71.   As to WorkForce Now specifically, Trueira testified that he never received any formal training. (*Id.* at 59:19-:20.)

72.   Trueira also acknowledged, however, that when he first began to work in Comprehensive Services, he had asked Whittier if he could attend some demonstrations of WorkForce Now, a request which she granted. (*Id.* at 31:14-:21.) Trueira recalled watching videos and observing live demonstrations of the WorkForce Now product. (*Id.* at 31:11-:21, 59:22-:25.)

73.   Whittier agreed that Trueira had "on-the-job training like watching demonstrations" of WorkForce Now that were given to clients, and also observed demonstrations of WorkForce Now in the office, as per his request. (*Id.* at 82:22-83:6-:8.)

74.   Whittier did not direct Trueira to get training in Comprehensive Services or in Workforce Now through through the Blackboard Integration site. (*Id.* at 78:19-:22.)

75.   Whittier believed that Trueira "gained sufficient knowledge" to be able to talk to a client about "some parts of" WorkForce Now. (*Id.* at 91:25-92:8.)

76.   While employed by ADP, Trueira also attended periodic, local sales trainings that all sales representatives were required to attend. (Trueira Cert. ¶ 32.)

11

77.   When a person is hired by ADP as a District Manager in its Major Accounts Division and does not have experience with Workforce Now, ADP "typically" enrolls the person in new-hire training for Workforce Now. (Tr. 76:9-:17.) That training includes listening to product demonstrations, shadowing different sales processes, meeting with ADP's business consultants who demonstrate the product, and engaging in discussions regarding aspects of Workforce Now. (*Id.* at 76:9-:25).

### E. Trueira's Agreements with ADP

#### 1. Sales Representative Agreement and Non-Disclosure Agreement

78.   As a condition of employment with ADP, new sales associates enter into a Sales Representative Agreement ("SRA") and a Non-Disclosure Agreement ("NDA") before being exposed to ADP's confidential information. (Whittier Decl. ¶ 10.)

79.   On July 12, 2012, nearly a month before his official start date, Trueira electronically accepted a SRA and NDA. (SRA; NDA; Trueira Cert. ¶ 3; Whittier Decl. ¶¶ 10, 11.)

80.   The SRA includes a "NON-SOLICITATION, NON-DISCLOSURE, NON-USE AND NON-HIRE" provision. (SRA ¶ 4.) The provision provides, in relevant part:

> (a) Employee agrees that during the period commencing the date Employee becomes an employee of the Company and ending one year after the date Employee ceases to be an employee of the Company for any reason whatsoever (the "Non-Solicitation Period"), Employee shall not, on Employee's behalf or on behalf of any other person, corporation, partnership or other entity whatsoever (a "Person"), directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client, bona fide prospective client or marketing partner of the Company before the date Employee ceases to be an Employee of the Company (the "Termination Date") that (i) was located in any territory Employee managed or to which Employee was assigned or covered during the two-year period prior to the Termination Date and/or (ii) Employee was assigned, managed and/or had knowledge of, contact or involvement

12

with during the two-year period prior to the Termination Date,
to sell, license or lease any software, product or service
competitive or potentially competitive with any software,
product or service sold, licensed, leased, provided or under
development by the Company during the two-year period
prior to the Termination Date, *provided that the restrictions
set forth in this paragraph shall only apply to clients, bona fide
prospective clients or marketing partners of businesses of the
Company with which the Employee was involved or exposed.*

(b) During and after Employee's employment with the Company,
Employee will not disclose to any Person any business
methods, procedures, pricing and marketing structure and
strategy, programs, forms, confidential information, trade
secrets, the names and addresses of current clients, former
clients and prospective clients of the Company, or other data
and information relating to the Company, its vendors,
licensors, marketing partners or clients, learned by Employee
at any time during Employee's employment with the Company
(the "Information"). Upon termination of Employee's
employment with the Company, Employee will return all
copies of all materials which belong to the Company (whether
or not such materials were prepared by the Company) and
which are in Employee's possession or over which Employee
exercises any control.

(c) Employee will not, during the Non-Solicitation Period, except
in the course of fulfillment of Employee's duties as an
employee of the Company, use or act upon in any way,
directly or indirectly, any information which became known
to Employee during the course of Employee's employment
with the Company concerning the identity or business activity
of any current clients, former clients, prospective clients
and/or marketing partners of the Company.
. . .

(*Id.* (emphasis added). "Client" and "prospective client" are defined as
"includ[ing] without limitation any entity to or for whom the Company
provides or proposes to provide, as applicable, products or services either
directly or indirectly, whether as a vendor, subcontractor to another
vendor or otherwise, whether or not privity of contract exists between the
Company and such entity." (*Id.* at ¶ 4(f)).

13

81. The NDA contains similar language as to non-disclosure of confidential information and trade secrets. It provides, in relevant part:

> During and at any time after [the employee's] employment with Automatic Data Processing, Inc. and/or any of its divisions, subsidiaries and affiliates (collectively "ADP"), [the employee] shall not, except in connection with [his or her] duties as an ADP employee, on [his or her] behalf or on behalf of any other person, corporation, partnership or other entity whatsoever (each, a "Person"), access, use, or disclose to any Person any confidential information, trade secrets, or other proprietary information of ADP, its vendors, licensors, marketing partners, business partners, or clients (including, but not limited to, (i) ADP's business methods, procedures, pricing and marketing structure and strategy which are not publicly available and which [the employee] did not learn from a public source, (ii) ADP's source and object codes, computer screens, programs and forms, experimental or research work, methods, processes, formulas, or drawings, (iii) the names, addresses and business activities of ADP's current, former and prospective clients, and (iv) the names, addresses, and personal information of ADP's and ADP's current, former, and prospective clients' employees), learned by [the employee] at any time during [his or her] employment with ADP (collectively, the "ADP Information").

(NDA ¶ 3(b). *See id.* at ¶ 2.)

82. As to post-ADP employment, the NDA also includes a non-solicitation provision. It provides, in relevant part

> (b) During the period commencing on the date [the employee] cease[s] to be an ADP employee for any reason whatsoever (such date, being the "Termination Date") and ending on the date that is twelve months thereafter, [the employee] shall not, on [his or her] behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person that was a client, bona fide prospective client, marketing partner or business partner of ADP before the Termination Date to sell, market, license, lease or provide any software, product or service competitive or potentially competitive with any software, product or service sold, marketed, licensed, leased, provided or under development by ADP during the two-year period prior to [the employee's] Termination Date, provided that the restrictions set forth in this paragraph 3(b) shall only apply to clients, bona fide prospective clients, marketing partners or business partners of businesses of ADP with which [the employee] was involved.

14

(*Id.* at ¶ 3(b). *See id.* at ¶ 3(c) (defining "client" and "prospective client" as "includ[ing], without limitation, any Person to or for whom ADP provides or proposes to provide, as applicable, products or services, either directly or indirectly, whether as a vendor, subcontractor to another vendor or otherwise, and whether or not privity of contract exists between ADP and such Person").

### 2. Restrictive Covenant Agreement

83.   The Restrictive Covenant Agreement ("RCA") is associated with ADP's restricted stock award program. An ADP employee must electronically accept the terms of an RCA before he or she can receive restricted stock through ADP's restricted stock award program. (Donohue Decl. ¶ 7; Whittier Decl. ¶ 13.)

84.   ADP limits participation in the stock award program to certain high-performing employees. (Whittier Decl. ¶ 13.) Restricted stock is offered annually to sales employees who meet their annual sales targets. (*Id.*)

85.   Unlike the SRA and the NDA, which must be signed by employees before they officially begin their employment and before they have access to confidential information, RCAs are optional agreements which are provided to employees during their employment.

86.   Although newly hired District Managers are provided with ADP confidential and proprietary information, they are not required to sign RCAs when they are first employed. (Tr. 112:5-:17.)

87.   ADP's restricted stock award program was serviced through Morgan Stanley until 2014. Since 2014, it has been serviced through Fidelity. (Donohue Decl. ¶ 3.)

88.   Since 2014, an employee who is offered a stock award logs into a Fidelity website and must select "'Restricted Stock Awards Plan.'" (*Id.* at ¶ 8.) The employee then sees a list of stock awards for which he or she is eligible. (*Id.*) To accept a stock award, the employee must select "'Begin Acceptance.'" (*Id.*) The employee is then shown a new screen, titled

"'Accepting Your Grants,'" which identifies the number of stock grants a particular employee may accept. (*Id.*)

89.   Next, the employee is provided a link to the Grant Agreement, which includes an RCA. The employee is provided a link to open and/or save the Grant Agreement. The employer must then check a box which states: "'I have read and agree to the terms of the Award Agreement and the Restrictive Covenant Agreement.'" (*Id.* at ¶ 9.)

90.   After checking the box, the employee has three options: 1) "'Accept Your Grant'" to submit the stock award acceptance, 2) "'Decline Grant'" to decline the award, or 3) "Cancel." (*Id.* at ¶ 10.)

91.   If the employee selects the "'Accept Your Grant'" option, acceptance of the RCA is not optional. The system is set up in a manner that requires either acceptance or rejection of the entire set of agreements associated with the award. (*Id.* at ¶ 11.)

92.   While Trueira worked in ADP's Total Source Division, he was awarded restricted stock on 3 occasions: September 3, 2013, September 2, 2014, and September 1, 2015. (Donohue Decl. ¶ 5.; Tr. 10:23-:25. *See* Donohue Supplemental Decl., Exhs. 1 and 2) (Grant Acceptance documents from Morgan Stanley and Fidelity which show Trueira's Award Dates).)

93.   In February 2018, shortly after leaving ADP, Trueira was served with a letter from ADP's attorneys which attached copies of the RCAs. (Trueira Cert. ¶ 25.)

94.   On February 20, 2018, counsel for ADP sent Trueira a letter that reminded Trueira of his obligations under the RCAs. (Compl. Exh. H.) The letter enclosed a copy of the RCAs and stated:

Please provide to me in writing, on or before February 28, 2018 confirmation that you will abide by your contractual obligations to ADP and that you have returned all of ADP's property. Further please include in your response the identity of your new employer, a description of your job duties, and the geographic territory for which you are responsible.

(Id. at 4) (emphasis in original. *See* 2013 RCA ¶ 7, 2014 RCA ¶ 7, 2015 RCA ¶ 8.) Trueira "vaguely" recalled having received the letter. (Tr. 23:24-

24:1.) He also recalled reading the RCAs attached to the letter, but not in their entirety, and in particular he claimed he did not read paragraph 7. (*Id.* at 27:15.)

95.   The 2013 RCA associated with Trueira's 2013 stock award was electronically accepted on September 19, 2013. (Donohue Supplemental Decl., Exh. 1).

96.   The 2014 RCA associated with Trueira's 2014 stock award indicates an acceptance date and time of September 30, 2014 at 10:40 AM Eastern Standard Time. (Donohue Decl. Exh. B at 6)

97.   The 2015 RCA associated with Trueira's 2015 stock award indicates an acceptance date and time of September 30, 2015 at 11:10 AM Eastern Standard Time. (Donohue Decl. Exh. C at 8. *See* Donohue Supplemental Decl., Exh. 2).

98.   Trueira clearly remembers accepting the stock awards. He claims to have no memory, however, of "ever being asked to sign or to acknowledge the acceptance of a restrictive covenant as a condition of receiving the incentive stock award." (Trueira Cert. ¶ 30.)

99.   Trueira also claims that he cannot recall: 1) anyone at ADP ever providing him with copies of the RCAs, 2) anyone at ADP advising him that he was bound by RCAs because he accepted an incentive stock award, 3) anyone at ADP telling him that if he accepted an incentive stock award, a condition of accepting the award was that he would have to agree to be bound to a RCA, 4) going onto a third-party portal to accept his stock awards, 5) whether the portal was from Morgan Stanley or Fidelity, and 6) whether anything on the portals stated the words "restrictive covenant." (Tr. 55:15-56:14. *See* (Trueira Cert. ¶¶ 26, 27).

100. The Court does not find Trueira's claim to lack any memory of accepting restrictions in connection with the stock awards to be credible.

101. The 2013, 2014 and 2015 RCAs bind Trueira to substantially similar provisions. *See* (2013 RCA ¶¶ 3, 4, 6; 2014 RCA ¶¶ 3, 4, 6; 2015 RCA ¶¶ 3, 4, 6).

102. The RCAs contain provisions that are not found in the SRA and NDA, including a non-compete provision, an attorneys' fee provision, and a contractual tolling provision.

103. The 2015 RCA[6] includes the following non-compete provision:

> [the employee] agree[s] that during [his or her] employment and for a period of twelve (12) months from the voluntary or involuntary termination of [his or her] employment for any reason and with or without cause, [he or she] will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a *Competing Business* anywhere in the *Territory* where doing so will require [the employee] to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use or disclose ADP's *Confidential Information* or trade secrets. However, after [his or her] voluntary or involuntary termination of [his or her] employment for any reason and with or without cause, nothing shall prevent [the employee] from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

(2015 RCA ¶ 3) (emphasis added). *See id.* at ¶ 1(j) (defining "Territory" as "the geographic area where [the employee] worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of [the employee's] employment with ADP"); *id.* at ¶ 1(d) (defining "Competing Business"); (*id.* at ¶ 1(e) (defining "Confidential Information").)

104. The 2015 RCA also includes a non-solicitation and non-interference provision as to ADP's clients, business partners, and vendors. The provision related to "Clients" states:

> [The employee] agrees that during [his or her] employment and for a period of twelve (12) months following the voluntary or involuntary termination of [his or her] employment for any reason and with or without cause, [the employee] will not, either on [his or her] own behalf or for any *Competing Business*, directly or indirectly, solicit,

---

[6]   I here quote the 2015 RCA, the most recent. The 2013 and 2014 RCAs are similar.

divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from *any Client* for the purposes of providing products or services that are the same as or substantially similar to those provided in the *Business of ADP,* for any Client: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP within the one (l) year period prior to [his or her] voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; (iii) whom ADP has provided products or services in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; (iv) whom ADP has solicited in connection with the Business of ADP within the two (2) year period prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; or (v) about whom [the employee] ha[s] any Confidential Information or trade secret information. [The employee] also agree[s] that [he or she] will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

(*Id.* at ¶ 4(a)) (emphasis added). A "Client" is defined as "any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, or government entity for whom ADP provided or provides products or services in connection with the Business of ADP or whom ADP has actively solicited in connection with the Business of ADP." (*Id. at* ¶ 1(c). *See also id.* at ¶ 1(a) (defining "Business of ADP").)

105. Additionally, the RCA contains a "Non-Disclosure and Non-Use of Confidential Information and Trade Secrets" provision. (*See id.* at ¶ 6.)

**F. Trueira's Resignation and Employment with Ultimate**

106. In late December 2017, Trueira began the interview process with Ultimate, a direct competitor of ADP. (Tr. 13:1-:9, 41:6-:7.)

107. During the interview process, persons at Ultimate told Trueira that ADP might "come after [him] for violation of a non-compete," and put him in touch with an attorney. (*Id.* at 13–18)

108. Around the time of his departure, Trueira stated, he discussed the potential of litigation with Nicole Rafferty, a former ADP employee who now works for Ultimate, but only "vaguely." (*Id.* at 18–19)

109. Nevertheless, Trueira took no steps to find out if he had any contractual obligations not to compete or to inform ADP of the identity of his new employer. (*Id.* at 20, 27)

110. On or about January 26, 2018, Trueira accepted a position with Ultimate. (*Id.* at 12:18-:21).

111. Trueira resigned from ADP on Friday, February 9, 2018, after working for approximately 7 months in ADP's Comprehensive Services division, and working for ADP for a total of about 5 ½ years. (Trueira Cert. ¶ 42.)

112. Trueira represented that he returned "everything" to ADP, including handwritten notes from his time with the Total Source Division. (Tr. 70:10-:16, 106:18-:20. *See* Trueira Cert. ¶ 42.)

113. Trueira did not provide any ADP employees, including his supervisor, Whittier, with any information identifying his new employer, notwithstanding their direct questions about his post-ADP employment. (Tr. 11:23-12:14, 19:19-:22).

114. Trueira testified that he was unaware that he had a contractual obligation to disclose information about his new employer to ADP. (*Id.* at 20:16-:19. *See* Trueira Cert. ¶ 44.) I did not find Trueira credible on this point, finding at the very least that he consciously avoided learning of the contents of the agreements.

115. Trueira began employment with Ultimate as a Strategic Development Manager on the following Monday, February 12, 2018. (Trueira Cert. ¶¶ 45, 46.)

116. As a Strategic District Manager, Trueira sells ULTIPRO to businesses with 200 to 500 employees, and has been assigned to sell ULTIPRO in Rhode Island, Massachusetts, Maine, Vermont, and New Hampshire. (*Id.* at ¶ 46.)

117. ULTIPRO is a software platform that is a unified, bundled package of payroll and human resources information systems. (*Id.* at ¶ 45.)

118. Ultimate does not offer professional employer organization services to its clients. (*Id.*)

119. Ultimate's ULTIPRO software platform is directly competitive with ADP's Workforce Now software platform. (Tr. 42:9-:11, 42:15-:19.)

120. Trueira stated, however, that he believes Ultimate's ULTIPRO is not competitive with ADP's Comprehensive Services, the product he previously sold at ADP. (*Id.* at 67:10-:12.)

121. ADP's Comprehensive Services is at least generally competitive with Ultimate's "managerial services." (Whittier Suppl. Decl. ¶ 8.) Trueira maintains, however, that Ultimate's managerial services are sold not by himself but by other sales representatives with whom he has no contact or relationship. (Trueira Cert. ¶ 45.) I make no factual finding on the point.

122. At Ultimate, Trueira has about 400 accounts assigned him. (Tr. 47:7-:9.) Trueira estimated that approximately 40% of those accounts currently use ADP products. (*Id.* at 47:10-48:18.)

123. Trueira's territory as an Ultimate employee overlaps with his former ADP territory of Northern Massachusetts, the greater Boston area, New Hampshire, and Maine except for some areas in Massachusetts, Rhode Island, and Vermont. (*Id.* at 41:15-:18.)

124. At the hearing, Trueira testified that if he were restricted from selling ULTIPRO in Northern Massachusetts, the greater Boston area, Maine, and New Hampshire, he could still sell ULTIPRO in other parts of Massachusetts, Rhode Island, and Vermont. (*Id.* at 43:17-:21). He acknowledged that such a restriction would "drastically limit" his account base and while he could still work, he would not be able to work as "fruitfully." (*Id.* at 43:21-:23.)

### G. Trueira's Interaction with ADP Clients While at Ultimate

125. At Ultimate, Trueira has approximately 400 prospects in his sales force database. He estimated or guessed that approximately 10% were ADP clients in fact. (*Id.* at 47–48)

126. As an Ultimate employee, Trueira had contact with ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, an ADP client in Rhode Island with about 400 employees. (*Id.* at 45:2-:19.)

127. He testified that he "solicited" that entity. (*Id. See* Trueira Dep. 124:10-125:2.)

128. He also acknowledged that he met a representative from ▮▮▮▮▮▮ at an Ultimate event. When he introduced himself to all of the attendees, Trueira stated that he had about 6 years of experience in human capital business, the majority of which was with ADP and now with Ultimate. (Tr. at 45:13-:25, 66:24-:25.)

129. The only further contact Trueira has had with ▮▮▮▮▮▮ has been a phone call and e-mail. (*Id.* at 67:1-:5.)

130. ▮▮▮▮▮▮ was not Trueira's client or prospective client when he was employed by ADP. (*Id.* at 46:11-:13, 67:6-:9.)

131. As an Ultimate employee, Trueira considers himself to be in the prospecting stage with ▮▮▮▮▮▮. (Trueira Depo. 128:12-:14.)

132. Moreover, at Ultimate, Trueira is assigned to work with ▮▮▮▮▮▮, a company which appeared under "leads" on Trueira's ADP pipeline.

133. As an Ultimate employee, he sent ▮▮▮▮▮▮ an e-mail and invited it to an event. The company later declined the invitation. (Tr. at 49:12-50:8.)

134. Trueira explained that he placed ▮▮▮▮▮▮ under the "leads" section of his ADP pipeline because an ADP District Manager had told him that he wanted to talk to him about that account. (*Id.* at 49:23-:24.)

135. Trueira never personally contacted ▮▮▮▮▮▮ while he was employed at ADP. (*Id.* at 61:1-:9.)

136. ████████ remains an account assigned to Trueira at Ultimate. (*Id.* at 50:12-:13.)

137. As an Ultimate employee, Trueira has not had any contact with the prospects listed on the top of his ADP pipeline, or the leads in the bottom of the pipeline, aside from ████████. (*Id.* at 64:4-:13.)

## II.    Analysis/Conclusions of Law

"A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (numbering added); *accord American Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Because a preliminary injunction is "an extraordinary and drastic remedy," the plaintiff must establish each element by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–30 (2d ed. 1995)). Even then, a trial court's decision to issue a preliminary injunction is "an act of equitable discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[7]

A Court will consider all four factors, but the first two are essential. *See Adams v. Freedom Forge Corp.*, 204 F. 3d 475, 484 (3d Cir. 2000); *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." (quoting *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir. 1982)); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987);

---

[7]      In a diversity case, a federal court applies the federal standard to the question of whether a preliminary injunction is warranted, pursuant to Fed. R. Civ. P. 65. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989).

*Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *American Express*, 669 F.3d at 366, 374. *But see Conestoga Wood Specialties Corp. v. Secretary of U.S. Dept. of Health and Human Services*, 724 F.3d 377 (3d Cir. 2013) (debating whether there is a "sliding scale" of the four factors).

ADP argues that the four preliminary injunction factors weigh in its favor and that, pursuant to the non-solicitation and non-compete provisions in the RCAs, the SRA, and the NDA, this Court should, *inter alia*, enjoin Trueira for a one-year period from 1) providing services for Ultimate in the same geographic territory as he covered for ADP, and 2) soliciting business from "any Client" of ADP or encouraging "any Clients" to cease doing business with ADP, with the exception of prospective clients that Trueira had no knowledge of while working at ADP.

For the reasons explained below, I find that ADP is entitled to injunctive relief under the SRA and the NDA, but not the RCAs.

### A. Likelihood of success on the merits

To show a likelihood of success, ADP must establish "a reasonable probability, not the certainty, of success on the merits." *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980).

ADP bring claims against Trueira for: (1) breach of contract; (2) breach of duty of loyalty; and (3) unfair competition. (Compl. ¶¶ 64-88). As to Count 1, breach of contract, ADP alleges that Trueira has breached "all or some of the Agreements," collectively referring to the SRA, the NDA, and the three RCAs. (*Id.* at ¶¶ 4, 69-70.) It is fair to say that the main goal of ADP's request for injunctive relief, however, is to enjoin Trueira from violating the RCAs.

To establish a breach of contract claim, a plaintiff must demonstrate (1) the existence of "a valid contract between the parties"; (2) the defendant's "failure to perform a defined obligation under the contract"; and (3) that the plaintiff "sustained damages" as a result. *EnviroFinance Grp., LLC v. Envtl. Barrier Co., LLC*, 440 N.J. Super. 325, 345 (App. Div. 2015) (citing *Murphy v.*

*Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007)).[8] The parties dispute the first two elements: whether the non-solicitation and non-compete provisions of the RCAs are enforceable (and if so, to what extent they are enforceable),[9] and whether ADP can establish a breach or likely breach of the RCAs, SRA, and NDA.

As to the RCAs, Trueira argues that ADP is unlikely to succeed on the merits because 1) ADP is barred from enforcing the RCAs by the doctrine of issue preclusion (also known as collateral estoppel), 2) the RCAs are unenforceable restraints on trade, and 3) in the alternative, ADP fails to establish breach or likely breach of any enforceable provisions of the RCAs. As to the SRA and NDA, Trueira argues that ADP fails to establish breach or likely breach.

### 1. Issue preclusion

Trueira argues that three prior New Jersey decisions estop ADP from relitigating the issue of whether the RCAs are enforceable. Those three prior decisions were rendered by Judge Donald A. Kessler of the Superior Court of New Jersey, Chancery Division.[10] (Def. Br. 7-10; Def. Conc. Law ¶ 20). I am

---

[8]     The parties agree that New Jersey law applies in this action, pursuant to the choice of law provision in the RCAs, SRA, and NDA. *See* (2013 RCA ¶ 9; 2014 RCA ¶ 9; 2015 RCA ¶ 9; SRA ¶ 7; NDA ¶ 9.) "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state. Generally, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." *Nuzzi v. Aupaircare, Inc.*, 341 F. App'x. 850, 852 (3d Cir. 2009) (internal quotation marks omitted) (citing *Homa v. Am. Express Co.*, 558 F.3d 225, 227 (3d Cir. 2009)). Neither party asserts that the choice of law provision in the agreements violates public policy, and I see no reason why it would (unless of course it were applied overbroadly). Therefore, I will apply New Jersey law to the parties' dispute over the RCAs, SRA, and NDA.

[9]     Counsel for Trueira concedes that the SRA and NDA "contain fair and reasonable restrictive covenants" (Def. Conc. of Law ¶ 9), and "does not dispute their enforceability." (Def. Brf. 11 n.6.)

[10]     The three Judge Kessler decisions are *ADP, LLC v. Kusins*, Dkt. ESX-C-264-15 (Ch. Div. 2017) (ECF no. 21-2, Exh. 20 at 1-75, Letter Opinion); *ADP, LLC v. DeMarco*, Dkt. ESX-C-120-16 (Ch. Div. 2018) (ECF no. 21-2, Exh. 21, Hearing Transcript); and *ADP, LLC v Hobaica*, Dkt. ESX-C-118-16 (Ch. Div. 2018).

unpersuaded by this argument. Among other things, I note that the Judge
Kessler decisions selected by Trueira are three among many; other relevant
prior decisions went the other way, and are adverse to Trueira's position. Thus
I decline to hold that the matter is settled and cannot be relitigated.

Whether a state court judgment should have a preclusive effect in a
subsequent federal action depends on the law of the state that adjudicated the
original action. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir. 1999)
("To determine the preclusive effect of [the plaintiff's] prior state action we must
look to the law of the adjudicating state."); *Bouriez v. Carnegie Mellon
University*, 430 F. App'x. 182, 186 (3d Cir. 2011) (applying Pennsylvania law to
decide whether to give preclusive effect to a Pennsylvania state court decision).
The judgments as to which Trueira invokes collateral estoppel are New Jersey
state court decisions. I must therefore determine whether and to what extent
New Jersey law would give those rulings preclusive effect.

"'New Jersey courts follow the doctrine of collateral estoppel or the rule of
issue preclusion described in the Restatement of Judgments.'" *Barker v.
Brinegar*, 346 N.J. Super. 558, 566 (App. Div. 2002) (quoting *Hernandez v.
Region Nine Hous. Corp.*, 146 N.J. 645, 659 (1996)). Under New Jersey law,
collateral estoppel (also known as issue preclusion) "bars relitigation of any
issue which was actually determined in a prior action, generally between the
same parties, involving a different claim or cause of action." *State v. Gonzalez*,
75 N.J. 181, 186 (1977).[11]

> The primary purpose of collateral estoppel is 'to promote efficient
> justice by avoiding the re-litigation of matters which have been fully
> and fairly litigated and fully and fairly disposed of.' *Kortenhaus v. Eli
> Lilly & Co.*, 228 N.J. Super. 162, 166 (App. Div. 1988). Another is to
> protect individuals from 'vexatious repetitious litigation.' *Lubliner v.
> Bd. of Alcoholic Beverage Control*, 33 N.J. 428, 435 (1960).

---

[11]     There is no need to resort to broader doctrines, such as New Jersey's entire
controversy rule, which encompass issues that could have been, but were not, raised
in the prior action. There is no dispute that the issue in controversy here was actually
raised and decided in the prior cases.

*Lopez v. Patel*, 407 N.J. Super. 79, 93 (App. Div. 2009). The party seeking to invoke collateral estoppel must show that

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 521 (2006) (quoting *In re Estate of Dawson*, 136 N.J. 1, 20–21 (1994) (citations and parentheticals omitted)).

Notably, "[a]lthough the essential elements of the federal and state tests are similar, they are not identical because New Jersey will not apply collateral estoppel if it would be unfair to do so." *In re Liquidation of Integrity Ins. Co./Celotex Asbestos Tr.*, 214 N.J. 51, 67 (2013). The New Jersey Supreme Court has recognized that collateral estoppel "is a doctrine designed to accomplish various goals, a rule not to be applied if there are sufficient countervailing interests." *In re Coruzzi*, 95 N.J. 557, 568 (1984). Accordingly, in addition to the five criteria outlined above, a court must consider more generally whether preclusion would be fair, and the court retains discretion to grant or deny preclusion. *See Kortenhaus*, 228 N.J. Super. at 165 (recognizing that New Jersey adopted a "more flexible" collateral estoppel rule "which emphasized a discretionary weighing of economy against fairness").

> Fundamental to the application of estoppel is an assessment of considerations such as finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness. Indeed, such broader notions about fairness and finality echo in the variety of considerations that equity applies in estoppel-like circumstances.

*Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 85 (2012) (internal quotations and citations omitted).

Efficiency and fairness are both important goals. Nevertheless, "[e]fficiency is subordinated to fairness and, consequently, if the court is

satisfied that efficiency would lead to an unjust result," application of the equitable doctrine of collateral estoppel "should not be tolerated." *Barker*, 346 N.J. Super. at 566. *See Allen v. V & A Bros.*, 208 N.J. 114, 138 (2011) (quoting *Olivieri*, 186 N.J. at 521-22) (noting that "because [collateral estoppel] is an equitable doctrine, even if all five elements coalesce, it 'will not be applied when it is unfair to do so'"); *Kortenhaus*, 228 N.J. Super. at 166 (quoting *Blonder–Tongue Labs v. University Foundation*, 402 U.S. 313, 334 (1971)) (stating that application of collateral estoppel "'necessarily rest[s] on the trial courts' sense of justice and equity'").

Here, the issue sought to be precluded is the enforceability of the RCAs. That is an issue of law. In accordance with the above-mentioned fairness concerns, even where the prerequisites for issue preclusion are satisfied, courts can allow relitigation, particularly of a legal issue. In *City of Plainfield v. Pub. Serv. Elec. & Gas Co.*, the New Jersey Supreme Court explained this equitable proviso:

> The ability of a court to readdress previously adjudicated issues may under appropriate circumstances be exercised despite the narrow confines of issue preclusion or res judicata. This is especially true where, as in this case, the issue is purely one of law and a new determination is warranted to avoid inequitable administration of the law.

82 N.J. 245, 258–59 (1980) (citations omitted).[12]

When a defendant, like Trueira, raises the collateral estoppel bar against a plaintiff who previously lost the same issue against another defendant, the

---

[12]   *See Dawson*, 136 N.J. at 22–23 (1994) (following *Plainfield* and noting that even if all the elements of collateral estoppel existed, the Court would not apply the doctrine to the pure question of law before it); *see also* Restatement (Second) of Judgments § 28(2) (observing an exception to the doctrine where the issue "is one of law"). *But see* Restatement (Second) of Judgments § 27 cmt. c (recognizing that "[a]n issue on which litigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law ... if the issue [is] one of law, new arguments may not be presented to obtain a different determination of that issue").

application of the doctrine is described as "defensive" collateral estoppel. *Id.* at 164; *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979). In *Mann v. Estate of Meyers*, I cited the well-established benefits of the doctrine:

> Defensive collateral estoppel promotes judicial economy and fairness by denying a plaintiff the opportunity to serially relitigate identical issues by simply switching defendants. Viewed prospectively, it gives the plaintiff an incentive to join all defendants in a single lawsuit for fear of losing the ability to sue them separately later.

61 F. Supp. 3d 508, 523 (D.N.J. 2014) (internal citations omitted).

"Fundamental to the theory of collateral estoppel," however, "is the notion that the earlier decision is reliable, an underlying confidence the result was substantially correct." (Pl. Conc. of Law ¶ 60) (citing *Kortenhaus*, 228 N.J. Super. at 166 (citing Restatement (Second) of Judgments § 29 cmt. f. (1982))). Under Section 29 of the Second Restatement of Judgments, a plaintiff, in order to avoid the preclusion bar, must demonstrate that he or she "lacked full and fair opportunity to litigate the issue" in the prior proceeding, or that "other circumstances justify affording [plaintiff] an opportunity to relitigate the issue." Restatement (Second) of Judgments § 29 (1982).

Factors to be considered, in addition to those enumerated in Section 28, include whether "[t]he determination relied on as preclusive was itself inconsistent with another determination of the same issue." *Id.* § 29(4). Comment (f) to Section 29 further elaborates on the effect of inconsistent prior determinations:

> *Inconsistent prior determination.* Giving a prior determination of an issue conclusive effect in subsequent litigation is justified not merely as avoiding further costs of litigation but also by underlying confidence that the result reached is substantially correct. Where a determination relied on as preclusive is itself inconsistent with some other adjudication of the same issue, that confidence is generally unwarranted. The inference, rather, is that the outcomes may have been based on equally reasonable resolutions of doubt as to the probative strength of the evidence or the appropriate application of a legal rule to the evidence. That such a doubtful determination has been given effect in the action in which it was reached does not

require that it be given effect against the party in litigation against another adversary.

*Id.* § 29 cmt. f (emphasis in original). *See Kortenhaus,* 228 N.J. Super. at 166 (stating that "[t]he considerations enumerated by the *Restatement* are largely tests by which confidence in the earlier decision may be measured").[13]

As noted above, Trueira cites three prior decisions by Judge Kessler (fully cited at n.10, *supra*). The first, *ADP, LLC v. Kusins,* is a letter opinion. The second, *ADP, LLC v. DeMarco,* is an oral, on-the-record opinion, relying on *Kusins.* The third, *ADP, LLC v Hobaica,* likewise relies on *Kusins.* None are reported.[14]

ADP does not really argue that Judge Kessler's three decisions would not meet the five enumerated prerequisites for issue preclusion. *See Olivieri,* 186 N.J. at 521. Rather, relying on principles of equity, fairness and reliability, ADP asserts that Judge Kessler's decisions are outliers, *i.e.,* decisions which are inconsistent with numerous other court rulings on the same issue. There have been, says ADP, "three federal court cases and an affirmance by the Third Circuit, and a Tennessee court applying New Jersey law and an affirmance by the Tennessee Court of Appeals." (Pl. Conc. of Law ¶¶ 61-63. *See* Pl. Reply Br. 4.) Those cases, likewise unreported, are *ADP, LLC v. Jacobs* ("*Jacobs*"), Civ. No. 2:15-3710, 2015 WL 4670805 (D.N.J. Aug. 5, 2015) (Linares, J.) (finding RCA enforceable except as to clients defendant did not gain knowledge of through his employment at ADP); *ADP, LLC v. Manchir* ("*Manchir*"), Case No. 14-14043 (Tenn. Ch. Ct., 20th Jud. Dist., August 11, 2016), *aff'd,* No. M2016-02541-

---

[13]     *See also Batson v. Lederle Labs., a Div. of Am. Cyanamid Co.,* 290 N.J. Super. 49, 52 (App. Div. 1996), *aff'd in part as modified,* 152 N.J. 14 (1997)(citing *Kortenhaus,* 228 N.J. Super. at 166, 168) ("The inconsistent verdicts erode a fundamental tenet on which the doctrine is based because the court can no longer rely on the presumption that the earlier decision was reliable and substantially correct.").

[14]     According to ADP, all three are or shortly will be on appeal. (Pl. Conc. of Law ¶ 61). That circumstance alone, however, would not deny them preclusive effect. *See Comm'r New Jersey Dep't of Banking & Ins. v. Budge,* No. A-0938-07T2, 2009 WL 2245764, at *7 (N.J. Super. Ct. App. Div. July 29, 2009) (citing cases and Restatement (Second) of Judgments § 13 comment g).

COA-R3-CV, 2017 WL 5185458 (Tenn. App. Sept. 6, 2017); and *ADP, LLC, v. Lynch* and *ADP, LLC v. Halpin* ("*Lynch/Halpin*"), Civ. Nos. 2:16-01053, 2:16-01111, 2016 WL 3574328 (D.N.J. June 30, 2016) (Martini, J.) (denying enforceability of RCA as to prospective clients as to which defendants did not gain knowledge at ADP), *aff'd*, 678 F. App'x 77 (3d Cir. Feb. 7, 2017)).[15]

    *Jacobs*, *Manchir*, and *Lynch/Halpin*, interpreting the same ADP agreement, reached a result contrary to that reached by Judge Kessler. As a matter of equity and common sense, I cannot confidently state that Judge Kessler's decisions settle the issue, or that their correctness is manifest. In that conclusion, I am supported by *ADP, LLC v. Rafferty*, No. CV 18-1922, 2018 WL 1617705 (D.N.J. Apr. 3, 2018) (internal citations omitted). There, Chief Judge Jose L. Linares (the author, as it happens, of *Jacobs*), considered the preclusion issue, presented as here in the context of a preliminary injunction application, and denied the application of collateral estoppel:

> The Court is also not convinced of the success, or lack thereof, of the argument that the RCAs are unreasonable restraints on trade under collateral estoppel, which was discussed in the parties' briefs and at oral argument. The fact that there are decisions both upholding and rejecting the RCAs does not make it any more likely that Plaintiff shall succeed on the merits, which is all the Court is currently considering.

2018 WL 1617705 at *4.[16]

    I cannot consider Judge Kessler's decisions in a vacuum. It would be inappropriate for this Court to give preclusive effect to three cherry-picked decisions, in light of the substantial contrary authority, some of it from this very District. *Cf. Parklane Hosiery*, 439 U.S. at 330 n.14 (in context of offensive

---

[15]    It also points out that three rulings by Judge Thomas Moore of the Superior Court of New Jersey, Chancery Division, Essex County, which post-date Judge Kessler's *Kusins* decision, enforced the RCAs "albeit with some blue-penciling." (Pl. Conc. of Law ¶ 64.) Those decisions are pending before the New Jersey Superior Court, Appellate Division. (*Id.*)

[16]    *Rafferty* is currently on appeal to the United States Court of Appeals for the Third Circuit.

collateral estoppel, citing potential unfairness of claiming estoppel effect of a single favorable case among other unfavorable ones); *see also* Restatement (Second) of Judgments § 88(4).

I therefore conclude that ADP is likely to succeed in showing that it is not estopped from litigating whether the RCAs are enforceable.

### 2. Validity of the RCAs, NDA, and SRA

Restrictive covenants, such as the agreements at issue here (the RCAs, the NDA, and the SRA) may in general be enforced. Such restrictive covenants, however, must be scrutinized closely, because they have the potential to stifle free competition and restrict the individual's right to exploit his or her skills and labor. *See Saturn Wireless Consulting, LLC v. Aversa*, No. CV 17-1637 (KM/JBC), 2017 WL 1538157 at *12 (D.N.J. Apr. 26, 2017) (citing case law). Under New Jersey law, a restrictive covenant is enforceable to the extent that it is reasonable under the circumstances of the case. *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 585 (1970); *Karlin v. Weinberg*, 77 N.J. 408, 417 (1978). More specifically, a restrictive covenant will be found reasonable if it "[1] protects the legitimate interests of the employer, [2] imposes no undue hardship on the employee, and [3] is not injurious to the public." *Karlin*, 77 N.J. at 417 (numbering added; internal quotations and citations omitted). As to the "legitimate interests" prong, it is well-established that a restrictive covenant is not valid if its sole purpose is to restrict competition, but may be valid to the extent it furthers some other legitimate goal of the employer. *See Solari*, 55 N.J. 571; *Whitmyer Bros. v. Doyle*, 58 N.J. 25, 33 (1971) (stating that an employer "has no legitimate interest in preventing competition as such," but nevertheless has "a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships").[17]

---

[17]   *See also Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 635 (1988) ("Courts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee. Ultimately, the consuming public would suffer from judicial nurturing of such naked restraints on competition.");

"Even if the covenant is found enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity." *Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 253 N.J. Super. 626, 634 (App. Div. 1992) (citing *Solari*, 55 N.J. at 585).[18] New Jersey law therefore authorizes the Court to modify, or "blue pencil" a restrictive covenant's geographic scope, temporal scope, or "scope of activity" to the extent it crosses the line into unreasonableness. *See Karlin*, 77 N.J. at 421 n.4 (recognizing that courts "may compress or reduce the geographical areas or temporal extent of their impact so as to render the covenants reasonable").[19]

The agreements at issue here are the SRA, NDA, and RCAs. Before discussing the validity of each agreement, I will briefly review the relevant provisions. The focus of the preliminary injunction application is on the non-solicitation provisions of these agreements.

The SRA includes a non-solicitation provision. It provides that for a one-year period after ceasing employment, Trueira cannot solicit "clients, bona fide prospective clients or marketing partners of businesses of [ADP] with which [he] was involved or exposed." (SRA ¶ 4(a).) Similarly, the NDA's non-solicitation provision provides, in relevant part, that for a one-year period after ceasing employment, Trueira cannot solicit "clients, bona fide prospective clients, marketing partners or business partners of businesses of ADP with which [he] was involved." (NDA ¶ 3(b).) *See* Section I.E.1, *supra* (quoting the relevant SRA and NDA language at greater length).

---

*id.* (acknowledging that "in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable").

[18]    *See The Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 57–58 (2005) (citing *Whitmyer*, 58 N.J. at 32, and stating that "[d]epending upon the results of [the *Solari/Whitmyer*] analysis, the restrictive covenant may be disregarded or given complete or partial enforcement to the extent reasonable under the circumstances").

[19]    *See also id.* at 62 (finding that the Appellate Division should have decreased the geographical limitation of the restrictive covenant, and stating that "[w]hen it is reasonable to do so, courts should not hesitate to partially enforce a restrictive covenant").

As compared with the SRA and NDA, the RCA is far broader. It includes a one-year non-compete provision within a defined territory. It also imposes broader non-solicitation and non-disclosure obligations provisions. (Pl. Findings of Fact ¶ 28. *See also* Section I.E.2, *supra* (quoting relevant RCA language at greater length).) The RCA's[20] non-compete clause states that Trueira shall not "participate in any manner with a Competing Business anywhere in the Territory where doing so [would] require [Trueira] to (i) provide the same or substantially similar services to a Competing Business as those which [he] provided to ADP while employed, or (ii) use or disclose ADP's Confidential Information or trade secrets." (2015 RCA ¶ 3.) The RCA defines "Territory" as "the geographic area where [Trueira] worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of [his] employment with ADP." (*Id.* at ¶ 1(j).) The RCA's non-solicitation clause also restricts Trueira from soliciting business from any current or prospective ADP client for a one-year period after Trueira stops working for ADP. (*See id.* at ¶ 4(a) (using phrase "any Client").)

ADP concedes that as to *prospective* ADP clients, the RCA's non-solicitation clause should be blue penciled to cover only those about which Trueira had knowledge while employed by ADP. (Pl. Conc. of Law ¶ 82.) As to ADP's *current* clients, however, ADP maintains that the clause should be enforced as written. (*Id.*) Accordingly, a major dispute between the parties is whether, pursuant to the RCAs, Trueira can be broadly enjoined from soliciting any party which is in fact an existing ADP client, or whether, per the SRA and NDA, Trueira can only be enjoined from soliciting existing ADP clients as to which he had knowledge or involvement during his employment with ADP.

### i.   Validity of the RCAs

Trueira appears to be asserting that he is not bound by the RCAs because he has no memory of agreeing to them when he accepted the stock

---

[20]   Actually there is more than one RCA. For simplicity, I use the term "the RCA" to refer to the 2015 RCA, the most recent version potentially applicable to Trueira.

awards. I do not tarry over that argument. First, I did not find Trueira credible on this point. Second, his assent would bind him as a matter of law. New Jersey recognizes that "[w]hen a party enters into a signed, written contract, that party is presumed to understand and assent to its terms, unless fraudulent conduct is suspected." *Stelluti v. Casapenn Enterprises, LLC*, 203 N.J. 286, 305. Here, Trueira electronically checked a box affirming that he had read the documents and clicked the "accept grant" link. The grant of the stock options may well have been of primary interest, but he makes no allegations of fraudulent conduct as to the RCAs.

More substantial is Trueira's argument that the RCAs are unenforceable as an undue restraint of trade. Citing the first prong of the *Karlin* test, ADP maintains that the non-solicitation and non-compete provisions of the RCAs serve three "legitimate interests": (1) protection of ADP's relationships with its clients; (2) protection of its proprietary information, including trade secrets and client lists; and (3) protection of confidential information about its clients beyond their identities, including the clients' purchasing habits, service requirements, and ADP's marketing and sales strategies for those clients. (Pl. Brf. 17-18.)

Trueira does not dispute that ADP has a legitimate interest in protecting confidential information and customer relationships. (Def. Br. 11.) However, he argues that ADP's legitimate interests were already adequately protected by the SRA and NDA; therefore, as to those legitimate interests, the RCAs are superfluous. (*Id.*) Therefore, says Trueira, the RCAs are unenforceable restraints of trade. (*Id.* at 10-11.) In the alternative, Trueira argues, the RCAs should be blue-penciled to limit their scope. (*Id.* at 17-24.)

I will follow recent case law in this District, with which I agree. I find that the RCAs are not necessary to protect the legitimate interests of ADP as employer. *See ADP, LLC v. Mork*, No. CV 17-4613 (CCC-MF), 2018 WL 3085215

(D.N.J. June 22, 2018); *Rafferty*, 2018 WL 1617705.[21] As held in *Rafferty* by Chief Judge Linares, the RCAs appear to protect against the same harms already covered by the SRA and NDA. Citing *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727 (D.N.J. 1998), Judge Linares found it highly significant that ADP does not require all of its employees to enter into the RCAs and does not even offer the RCAs to all of its employees. *Rafferty*, 2018 WL 1617705, at *3.

ADP argues that Judge Linares's reliance on *Laidlaw* was misplaced, because its holding "is premised on the fact that Laidlaw historically did nothing to protect its confidential information." (Pl. Conc. of Law ¶ 79). I disagree. *Laidlaw* stands for the proposition that where 1) select employees are presented with a stock-option non-compete agreement, 2) those employees have already received confidential information and developed customer relationships before signing the agreement, and 3) no adverse action is taken against employees who do not sign the agreement, a legitimate purpose will not be found. Rather, under those circumstances, "the primary purpose of the stock-option non-competes is not to protect [the employer]'s legitimate interests, but to buy out potential competition." 20 F. Supp. 2d at 763.

Here, the SRA and NDA were already in place before Trueira was asked to sign the RCA. The legitimate concerns said to justify the RCAs were adequately vindicated by those prior agreements. Other employees were not required to sign RCAs, and indeed were not even asked to do so unless they were receiving bonuses in the form of stock awards. It therefore appears likely that through these RCAs, ADP sought to handcuff, and minimize the competitive clout of, a small class of particularly successful sales people. The case for the legitimacy of the RCAs is therefore weak. I find that Trueira is likely to prevail on his contention that RCAs' non-solicitation provisions are an undue restraint on trade and their purpose "is not to protect Plaintiff's

---

[21]     *Mork* and *Rafferty* are currently on appeal to the United States Court of Appeals for the Third Circuit.

legitimate interests but rather to decrease competition." *Rafferty*, 2018 WL 1617705, at *3.

I briefly consider the second, "undue hardship" prong of *Karlin*. In the alternative, I would also find that the RCAs are overbroad. They impose an undue hardship on Trueira to the extent they apply to all of ADP's existing clients, regardless of whether Trueira had any prior contact with them. *Rafferty*, 2018 WL 1617705, at *4. If I found the RCAs to be valid overall, I would be inclined to blue-pencil them to reduce their scope.[22]

ADP has not shown a substantial likelihood of success on the merits as to its claims under the RCAs. Trueira therefore will *not* be prohibited from working for Ultimate. He will be prohibited from soliciting ADP's clients only insofar as he may have known about them or had involvement with them through his employment at ADP. (*See* following section, discussing SRA and NDA.) In addition, I find the prohibition against use of ADP's proprietary information to be reasonable and enforceable.

### ii.   Validity of the SRA and NDA

The SRA and the NDA impose separate and independent limits. These, however, seem to be less controversial. ADP's claims under the SRA and NDA are likely to succeed on the merits because those agreements a) serve legitimate interests, b) impose no undue hardship, and c) are not injurious to the public. Indeed, counsel for Trueira now appears to concede that the SRA and NDA are reasonable and enforceable (Def. Conc. of Law ¶ 9; Def. Brf. 11 n.6.) I will nevertheless briefly discuss the relevant *Karlin* factors.

First, the SRA and NDA are intended to protect ADP's legitimate employer interests: ADP's confidential and proprietary information and client relationships. *Mork*, No. CV 17-4613 (CCC-MF), 2018 WL 3085215, at *4 (citing *Rafferty*, 2018 WL 1617705, at *4); *Rafferty*, 2018 WL 1617705, at *4 (citing

---

[22]    Given ADP's failure to satisfy 2 out of the 3 applicable factors of the conjunctive test, the "legitimate interests" factor and the "hardship" factor, I will not address the third factor: whether the RCAs are injurious to the public. *See Karlin*, 77 N.J. at 417.

*HR Staffing Consultants, LLC v. Butts*, Civ. No. 2:15–3155, 2015 WL 3492609, at \*8 (D.N.J. May 29, 2015)).

Second, enforcement of the SRA and NDA would not impose an undue hardship on Trueira. They are "narrowly tailored" to reach clients that Trueira dealt with or was exposed to. *Rafferty*, 2018 WL 1617705, at \*4. *See* (SRA ¶ 4(a); NDA ¶ 3(b)).

Third, the public interest factor weighs in favor of enforcing the SRA and NDA. *See Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 684 (D.N.J. 1999) ("Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships."). The public has an interest in protecting ADP's confidential information and business goodwill. *See Ingersoll*, 110 N.J. at 639 (recognizing the public's interest "in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and techniques in which the employer may be said to have a proprietary interest").

All three *Karlin* requirements are met (or rather, ADP has demonstrated a likelihood of success in demonstrating that they are met). The SRA and NDA's non-solicitation provisions are enforceable by preliminary injunction.

### 3. Breach of the SRA and NDA

The question, then, is whether ADP is likely to prevail on its contention that the non-solicitation provisions of the SRA and NDA, which I have found enforceable, have been breached or will be breached.

New Jersey courts tasked with interpreting a contract must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." *State Troopers Fraternal Ass'n of New Jersey, Inc. v. State*, 149 N.J. 38, 47 (1997). "Contracts should be read 'as a whole in a fair and common sense manner.'" *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014) (quoting *Hardy ex rel. Dowdell v. Abdul–Matin*, 198 N.J. 95, 103 (2009)).

38

Trueira maintains that "the non-solicitation provisions of the SRA and NDA (as correctly interpreted) only preclude Trueira from soliciting ADP clients or prospects *with whom he dealt* with [*sic*] at ADP." (Def. Br. at 26) (emphasis added). Therefore, because ADP "has not identified a single ADP client or prospective client that Trueira had dealings with at ADP that he has solicited since joining Ultimate," says Trueira, ADP is unlikely to establish a breach of the SRA and NDA. (*Id.* at 26-27).

First, I reject Trueira's attempt to confine the scope of this provision to "solicitation" (as he conceives of it). First, the agreements do not contain any indication that the term "solicit" is intended to depart from the ordinary meaning of the word. I therefore find the dictionary definition of "solicitation" to be instructive. "[S]olicitation" is defined, in part, as "[a]n attempt or effort to gain business." Black's Law Dictionary, p. 1520 (9th ed. 2009). Second, the reach of these agreements is not confined to solicitation. The SRA, for example, states that the employee may not "directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with" a client. Thus I do not find convincing Trueira's apparent belief that he may speak to or otherwise contact customers, with the object of gaining their business, without crossing the line to "solicitation."

More fundamentally, however, I do not accept the premise of Trueira's argument: that the non-solicitation provisions are confined to clients or prospects "with whom [Trueira] dealt" at ADP—*i.e.*, Trueira's own clients. The plain language of those agreements is enough to refute it. The NDA's non-solicitation clause applies to ADP clients and prospective ADP clients with which Trueira "was involved," while the SRA's non-solicitation clause similarly applies to ADP clients and prospective clients with which Trueira "was involved or exposed." (SRA ¶ 4(a); NDA ¶ 3(b).)

The terms "involved" and "exposed," in my view, broaden the scope of these provisions to include parties other than Trueira's own clients while he was at ADP. "[I]nvolved" is defined, in part, as "having a part in something," "actively participating in something," and "being affected or implicated."

*See* Merriam-Webster Online Dictionary, www.merriam-webster.com.
"[E]xpose" is defined, in part, as "to submit or make accessible to a
particular action or influence." *Id.*

The evidence placed before the Court shows a likelihood that Trueira
breached the proscription on soliciting at least one ADP client with which he
was "involved" or to which he was "exposed" while at ADP. There is a
reasonable probability that since leaving ADP, Trueira has violated the non-
solicitation provisions. As stated in Section I.G, *supra*, Trueira, after joining
Ultimate, sent an e-mail to ▇▇▇▇▇ inviting it to attend an event.[23] Although
▇▇▇▇▇ declined the invitation, it continues to be assigned to Trueira as a
client at Ultimate. Previously, as an ADP employee, Trueira apparently did not
contact ▇▇▇▇▇; however, he learned of ▇▇▇▇▇ through a conversation
with an ADP District Manager, and Trueira then added ▇▇▇▇▇ to his
pipeline as a "lead" (i.e., a company which Trueira and the District Manager
considered to be a potential client for ADP's Comprehensive Services). (Tr.
38:11-:12). Trueira testified that the companies would appear on the "leads"
list either because a meeting was held with that company or because someone
at ADP recommended going after that account. (*Id.* at 60:17-:21.)

On redirect examination, Trueira testified:

> . . . [the District Manager] had told me he wanted to talk to me about
> th[e] [▇▇▇▇▇] [account] because he thought we should discuss it,
> but that was the end of it, and then I left. I never had any contact or
> anything with him.

---

[23]    At the hearing, in response to a question of whether he believed he solicited
▇▇▇▇▇, Trueira answered: "I wouldn't say solicited. I sent them an email and
invited them to an event -- to an event, and they replied that they couldn't make it."
(Tr. 50:4-:6). The relevant question is whether Trueira's behavior qualifies as
"solicitation" under the terms of the NDA and SRA, not whether Trueira considers it to
be "solicitation." It may not ultimately matter, however, because the email surely falls
under the broader category of "contact."

(*Id.* at 49:23-50:1). He also stated that he did not have any discussions or contact with ███████, but acknowledged that the District Manager talked about ███████ being a client he should target. (*Id.* at 60:25-61:9).

The record before me demonstrates that 1) while at ADP, Trueira had access to ADP client ███████ and was implicated in ADP's goal of gaining ███████ as a Comprehensive Services client; and 2) since leaving ADP, Trueira has at least "contacted" ███████. I therefore conclude that as to Trueira's interaction with ███████, there is a reasonable likelihood that Trueira has violated the non-solicitation provisions in the SRA and NDA.[24]

To summarize, I find that as to the NDA and SRA, ADP has established a likelihood of success on the merits on its breach-of-contract claim. Those agreements are enforceable and there is a probability that Trueira has breached or, unless enjoined, will breach the non-solicitation provisions in the NDA and SRA. I also find reasonable the RCAs' restriction on use of ADP's proprietary information.

I will therefore address the two remaining elements necessary for the issuance of a preliminary injunction: whether ADP is likely to suffer irreparable

---

[24]  I note that there is also evidence that Trueira contacted ███████, a Rhode-Island-based ADP client, by phone and e-mail. (Tr. 67:1-:5). Trueira emphasizes that ███████ was never his client or prospective client when he was employed by ADP, which makes sense given that Trueira's territory did not include Rhode Island. (*Id.* at 46:11-:13, 67:6-:9.)

The relevant inquiry, however, is not whether an entity was Trueira's client or prospective client. Rather, the relevant inquiry is whether an entity was *ADP*'s client or prospective client before the date that Trueira ceased his employment with ADP, and whether Trueira was "involved" or "exposed" to that client.

Although ███████ identified itself as an ADP client to Trueira, it is unclear whether ███████ was an ADP client during the relevant time period, and Trueira's level of exposure to ███████ is also unclear. Accordingly, at this stage, I do not opine as to whether there is a reasonable likelihood that Trueira has violated the non-solicitation provisions in the SRA and NDA on the basis of his interactions with ███████.

harm in the absence of preliminary relief, and whether the balance of equities tips in ADP's favor.[25]

### B. Irreparable harm

Harm is considered "irreparable" if it is not redressable by money damages at a later date, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1964)). ADP has the burden of proving a "clear showing of immediate irreparable harm" absent injunctive relief. *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 225 (3d Cir. 1987). *See also Winter*, 555 U.S. at 21 (holding it was error to water down the irreparable harm requirement from "likelihood" to "possibility," even where likelihood of success was strong).

Here, ADP argues that the irreparable harm it will suffer is the loss of current and prospective clients, employees, marketing partners, confidential and proprietary information, and customer goodwill. (Pl. Br. 23-24; Compl. ¶¶ 57-62; Findings of Fact, *supra*, Section I(E)(1)).

Courts in the Third Circuit and this District have repeatedly recognized that the loss of business opportunities and goodwill constitutes irreparable harm.[26] Likewise, New Jersey courts recognize that "the diversion of a company's customers may [] constitute irreparable harm, [and that] [t]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages." *Fluoramics, Inc. v. Trueba*, No.

---

[25]     The fourth preliminary injunction factor requires that ADP establish that an injunction is in the public interest. *See Winter*, 555 U.S. at 20. That factor duplicates one I have already addressed, i.e., the "public interest" factor of the agreement-enforceability test. *See* Section II(A)(2)(ii), *supra*. I do not repeat that discussion here.

[26]     *See, e.g., Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."); *Laidlaw*, 20 F. Supp. 2d at 766 ("Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm."); *Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *8 (D.N.J. June 15, 2009) ("[w]here an employee solicits customers of his former employer on behalf of his new employer," there is irreparable harm).

BER-C-408-05, 2005 WL 3455185, at *8 (N.J. Super. Ct. Ch. Div. Dec. 16, 2005) (citation omitted).

I find that at a minimum 1) there is overlap between the two companies' lines of business, 2) ULTIPRO and WorkForce Now are similar products, 3) Ultimate is a direct competitor of ADP, and 4) Trueira works in his former ADP territory. *See* Findings of Fact, *supra*, Section I(F).

Record evidence shows that since resigning from ADP, Trueira has contacted at least one ADP client to which he was exposed or with which he was involved while at ADP. I readily surmise that he did so with the goal of having that company leave ADP and instead become a client of Ultimate. Trueira's geographic territory as an Ultimate employee includes Rhode Island, Massachusetts, Maine, Vermont, and New Hampshire; that geographic area overlaps with Trueira's former ADP territory of Northern Massachusetts, the greater Boston area, Maine, and New Hampshire.

That violation is not such a blatant or severe one. I cannot ignore, however, that Trueira has adopted the incorrect position that he has the right to contact any entity provided that it was not his own client while he was at ADP, and he adheres to a personal, narrow definition of "solicitation" that does not comport with the wording of the NDA and SRA agreements. He is at least in a position to violate the SRA and NDA, and his demeanor while testifying conveyed a sense of entitlement to do so. Under the circumstances, I do not think that the agreements themselves are a sufficient constraint. In addition, dealing with clients he learned about or had involvement with while at ADP would place him in a position to misuse proprietary information.

Taking these facts together, I find that ADP has made a clear showing that Trueira's behaviors establish a strong likelihood of irreparable harm to ADP that is independent of competitive harm. Such harm consists of misuse of confidential information, loss of business opportunities, and impairment of business goodwill.

The "irreparable harm" prong favors granting a preliminary injunction.

### C. Balancing the equities and the public interest

The final two prongs, balancing of the harms and the interest of the public, require little additional discussion. They also weigh in favor of granting injunctive relief.

I have discussed Trueira's hardship in Section II(A)(2)(ii), *supra*. Here, I add only that the alleged hardship to him is not a cognizable one; it consists only of requiring him to adhere to something well short of what he agreed to in the RCAs, SRA and NDA.

Within the next year, Trueira may continue working for Ultimate. During that time, he may not solicit, contact, call upon, communicate with or attempt to communicate with ADP's clients and prospective clients that he was involved with or exposed to while at ADP. He also may not disclose or exploit ADP's confidential or proprietary information. The opportunities still available to Trueira remain substantial, and the period of limitation is only one year.

As I have explained in Section II(A)(2)(ii), *supra*, the public interest warrants enforcement of the NDA and SRA.

In sum, all four preliminary injunction factors tip in favor of ADP, and the preliminary injunction will be granted.

### D. Duration of the Injunction

The SRA and NDA provide that the duration of the non-solicitation provisions shall run for "one year after the date employee ceases to be an employee." (He resigned on February 9, 2018.) ADP's proposed order would run for one year after the court's entry of a preliminary injunction.

I consider the competing equities, and adopt a middle position. I am cognizant, or course, that an ex-employee in a case like this may run out the clock by opposing the entry of preliminary relief, while remaining free (at least in his own mind) to violate an agreement in the interim. On the other hand, however, the proven violation of the agreements is not severe, and I have also found that ADP overreached in attempting to hold him to the more stringent non-solicitation provisions of the RDA.

44

Under the circumstances, I will make an equitable ruling that the period of the injunction shall run for eight months from the entry of this order.

### E. Attorney's Fees

As recognized by *Mork*, "'interim awards of attorney's fees are inappropriate where the only relief obtained is a preliminary injunction which may be subsequently overturned on the merits.'" 2018 WL 3085215, at *5 (quoting *Tarabour v. Twp. of Livingston*, No. 10–3213, 2011 WL 855312, at *4 (D.N.J. Mar. 9, 2011)). In addition, ADP seeks attorney's fees and costs in connection with enforcement of the RCA, a claim on which it has not (at least as yet) prevailed. I will therefore deny ADP's request for attorney's fees.

### III.   Conclusion

For the foregoing reasons, ADP's motion for a preliminary injunction (ECF no. 3) is granted in part and denied in part. Pursuant to the terms of the SRA and NDA, I will grant ADP preliminary injunctive relief. Defendant David Trueira shall be restrained, for a period of eight months after the date of entry of this preliminary injunction, from violating the agreements to the extent stated above.

Within five days, the parties shall submit an agreed form of preliminary injunction, which shall specify the relief granted to implement the above rulings, and shall include the amount of bond, which shall be posted within 15 days. *See* Fed. R. Civ. P. 65(c) (providing that this Court "may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined...."). If agreement cannot be reached, the areas of dispute shall be identified and the Court will rule. Within five days, counsel shall jointly propose an agreed set of redactions so that a version of this sealed Opinion may be filed publicly.

An appropriate Order follows.

Dated: August 2, 2018

KEVIN MCNULTY
**United States District Judge**