# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

ADP, LLC,

      Plaintiff,

      v.

DAVID TRUEIRA,

      Defendant.

Civ. No. 18-3666 (KM) (CLW)

**OPINION**

## KEVIN MCNULTY, U.S.D.J.:[1]

Before the Court is a renewal of a motion for a temporary restraining order (DE 56) brought on by an order to show cause filed by the plaintiff, ADP, LLC ("ADP"). The defendant, David Trueira, left his employment at ADP and joined a rival firm, Ultimate Software Group, Inc. ("Ultimate"). While at ADP, Trueira entered into three agreements containing restrictive employment covenants. Based on those covenants, ADP asked this Court to enjoin Trueira, for a period of one year, from providing services for Ultimate in the same geographic territory he covered for ADP and from soliciting business from any client of ADP or encouraging any clients to cease doing business with ADP.

---

[1]     Certain key items from the record will be abbreviated as follows:

| | |
|---|---|
| DE __ | = Docket entry number in this case |
| Compl. | = Complaint and jury demand (DE 1) |
| Whittier Decl. | = Declaration of Kate Whitter (DE 1-1) |
| Donohue Decl. | = Declaration of Katherine Donohue (DE 3-2) |
| Donohue Suppl. Decl. | = Amended Declaration of Katherine Donohue (DE 19-1) |
| Trueira Cert. | = Certification of David Trueira (DE 21-4) |
| Whitter Suppl. Decl. | = Supplemental Declaration of Kate Whitter (DE 29-2) |
| Tr. | = Transcript of Show Cause Hearing (DE 34) |

In a prior decision, I granted the motion in part and denied it in part, finding that two of the employee agreements (the "SRA" and the "NDA") were enforceable, but that a third, more restrictive one (the "RCA") was not enforceable. (DE 45). Then, in a case involving another employee named Rafferty, the Third Circuit disagreed, holding that the RCA was enforceable. In a separate order, the Third Circuit vacated my prior order and remanded for further proceedings in light of the Rafferty decision. (DE 55).

On remand, ADP has now renewed its motion for an injunction, citing the restrictions of the now-enforceable RCA. (DE 56) I heard additional oral argument from counsel, who did not seek to introduce any further testimony. APD's motion is **GRANTED** to the extent stated herein.

## I.   BACKGROUND

For ease of reference, I will here reprint from the prior Opinion my findings of fact, which have not changed.

On March 16, 2018, I denied ADP's request for a temporary restraining order but ordered expedited discovery and scheduled the matter for a hearing on the preliminary injunction application. (DE5). On April 18, 2018, I held an evidentiary hearing. (DE 32). The Court heard live testimony from two witnesses: David Trueira, who testified on his own behalf, and Kate Whittier, the Vice President of Sales for Major Account Services for ADP and Trueira's former supervisor, who testified on behalf of ADP. I accepted certifications and declarations from witnesses in lieu of direct testimony. Trueira and Whittier were cross-examined and also gave redirect testimony. The parties submitted documentary exhibits, as well as deposition transcripts. After the hearing, the parties submitted proposed findings of fact and conclusions of law. (DE 38 & 39).

In the course of the hearing, I had the opportunity to observe the demeanor of the witnesses and assess their credibility. In doing so, I considered such usual factors as the witnesses' apparent ability to recall; their general affect and demeanor; the apparent influence of bias or interest in shaping the narrative; the inherent plausibility of the accounts; and the extent

to which their testimony fit with other evidence. I kept in mind that discovery, to date, has necessarily been limited. I have accepted the bulk of both sides' factual contentions. Whittier's testimony, to be sure, had a pro-plaintiff slant. I had more difficulty, however, with the credibility of Trueira, who sometimes was evasive (employing such qualifications as "vaguely") and sometimes selective in what he remembered reading.

The following facts emerged from the evidentiary hearing and supporting documents:

### Trueira's Employment before working at ADP

1. Prior to working at ADP, Trueira had been working as a salesperson in business marketing and advertising for about seven years. (Trueira Cert. ¶ 19); *see also* (Tr. 50:19–22). He had never before worked in the areas of payroll and human capital management. (*Id.* at 50:14–17).

2. All of Trueira's knowledge, training, and experience in the area of payroll and human capital management began with ADP. (*Id.* at 50:25–51:2).

### ADP's Business

3. ADP is a Delaware limited liability company with its principal place of business in Roseland. New Jersey. (Compl. (¶ 2).

4. It is a provider of "business outsourcing and software services to clients, including human resources, payroll, tax, and benefits administration services." (*Id.* at 6).

5. ADP offers its services internationally and across the United States, including in New Jersey. (*Id.*).

### Trueira's Employment with ADP

6. On August 6, 2012, Trueira began employment with ADP in its Salem, New Hampshire office. (Trueira Cert. ¶ 2). On February 9, 2018, he resigned from ADP and immediately began his employment with Ultimate. (*Id.* ¶¶ 42 & 45).

### c. Employment in ADP's Total Source Division

7. At the beginning of his employment with ADP, Trueira sold ADP's Total Source products and services.[2] (*Id.* at 4).

8. Total Source is a professional employer organization program through which ADP would provide human resource services, employee benefits administration. and payroll services to employers. (*Id.*). Through outsourcing, ADP would step into the role of co-employer of each client's personnel for the purposes of payroll, employee benefits, and other aspects of employee management. (*Id.*); *see also* (Tr. 28:13–17 & 57:20–25).

9. When selling Total Source products and services, Trueira focused on employers of 25 to 75 employees. (Trueira Cert. ¶ 5).

10. Trueira recalls that he "rarely proposed and never sold Total Source products and services to employers with 200 or more employees." (*Id.*).

11. Approximately 70% of Trueira's business (solicitation and sales) was with existing ADP clients. (*Id.* ¶ 6). The remaining 30% of his business was with new ADP clients. (*Id.*).

12. Trueira solicited clients in two counties in northern Massachusetts and certain areas of Boston. (*Id.* ¶ 7).

---

[2]   In his Certification. Trueira generally describes his initial Total Source position as a "sales associate" position or "salesperson." (Trueira Cert. ¶ 2, 6 & 7). His subsequent position in Total Source was as a "Sales Executive." (*Id.* at 8). At the hearing. he specified that the positions he held while at Total Source were: "Total Source district manager. Total Source senior district manager; Total Source sales executive." (Tr. 29:1–2).

Kate Whittier, the Vice President of Sales in ADP's Major Accounts Sales Division who supervised Trueira during the last eight months of his employment, describes Trueira's initial role as a "District Manager I" position. (Whittier Decl. ¶¶ 2 & 3; Whitter Suppl. Decl. ¶ 2). According to Whittier, Trueira was subsequently promoted to District Manager on or about May 20. 2013. (*Id.* at ¶ 3). Moreover, on or about June 30, 2014, Trueira "was promoted to Total-Source Senior District Manager," and on or about June 29, 2015, Trueira "was promoted to Sales Executive" in Total Source. (*Id.*); *see also* (Compl. ¶ 9) (providing the same information).

13. During Trueira's time as a Total Source sales associate, ADP assigned him an electronic database. (*Id.*). Known as the "SalesForce database," the database contained client and prospective client information, including a client's name, contact information, number of employees, and telephone numbers. (Tr.32:16–33:6).

14. The SalesForce database identified approximately two hundred prospective clients for Trueira. (Trueira Cert. ¶ 7). Trueira was also referred leads by sales associates in ADP's Small Business Division and Major Accounts Division. (*Id.*).

15. In late June/early July 2015, about three years after Trueira began employment with ADP as a sales associate, he was promoted to a Sales Executive position in ADP's Total Source Division. (*Id.* ¶¶ 4 & 8; Whittier Decl. ¶ 3).

16. For about two years, Trueira managed a team of approximately six sales associates who sold Total Source products and services to ADP clients and prospective clients in northern Massachusetts and New Hampshire. (Trueira Cert. ¶ 8).

17. During this period, Trueira's team "rarely made a proposal and never sold Total Source products and services to any employer having 200 or more employees." (*Id.* ¶ 9).

### d. Employment in ADP's Comprehensive Services Division

18. In late June/early July 2017, Trueira was transferred to a Sales position in ADPs Comprehensive Services Division.[3] (*Id.* ¶ 10). Trueira was in that position for approximately seven months before he left ADP. (*Id.*).

19. Trueira's supervisor during his time in Comprehensive Services was Kate Whittier. (Tr. 29:17–19).

---

[3]     The parties dispute whether this was a promotion. I make no finding. *See* (Whittier Decl. ¶ 3; Trueira Cert. ¶ 10).

20. As a Comprehensive Services Manager, Trueira was considered an "overlay" sales representative who worked with District Managers who sold Workforce Now. (Trueira Cert. ¶ 13; Tr. 29:13–16).

21. ADPs Workforce Now is a technology platform for software that provides basic payroll and tax services. (Tr. 29:20–24). Individual modules can be added to that platform, including modules for applicant tracking, performance management, analytics, document storage, human resources, and time and attendance. (*Id.* at 29":5–30:18). Each module is an add-on to the basic Workforce Now product. (*Id.* at 74:12–14).

22. Trueira never sold ADP's Workforce Now product and services. (Trueira Cert. ¶ 17; *see also* Tr. 62:11–12).[4]

23. ADPs Comprehensive Services division sells such individual modules and services that function on the WorkForce Now platform.[5] (*Id.* at 30:23–31:10). Such services were sold individually, not as a bundled package. (Trueira Cert. ¶ 11).

24. Comprehensive Services therefore required ADP's Workforce Now as a platoon. (Tr. at 30:19–22; 31:7–9; 59:8–11).

25. Total Source, however, does not require Workforce Now as a platform. (*Id.* at 59:5–7).

26. Comprehensive Services is similar to Total Source but lacks the professional employer organization feature. (Trueira Cert. ¶ 11; *see also* Tr. 58:18–24 (describing Comprehensive Services as "people support" without the professional employee organization structure)).

---

[4] When asked if Trueira ever attempted to sell Workforce Now, Whittier responded "not to my knowledge." (Tr. at 88:21–23).

[5] As Whittier describes the two, ADP's WorkForce Now product is a software platform that clients

> purchase to manage payroll, benefits, time and attendance, etc. ADP's Comprehensive Services are an additional service offered. which provide clients consulting services in such areas as payroll, employee benefits, human resources, etc.

(Whittier Suppl. Decl. ¶ 7).

27. Comprehensive Services is an outsourcing by the client/employer of payroll processing and other services. (Trueira Cert. ¶ 11; see also Tr. 58:15–59:4; Whittier Decl. ¶ 3) (describing Comprehensive Services as "business process outsourcing services")). ADP would not, however, become a co-employer, as it did with Total Source. (Trueira Cert. ¶ 11).

28. A Comprehensive Services client would be assigned a "dedicated person" from ADP to assist it in a certain area or areas. (Tr. 29:8–11).

29. After Trueira sold clients Comprehensive Services products, he did not remain responsible for managing clients. ADP would "routinely assign a Relationship Manager with whom the client would deal concerning the Comprehensive Services provided to it." (Trueira Cert. ¶ 12).

30. Trueira would, however, interact with Comprehensives Services clients when they would request assistance with implementation issues. (Id.).

31. From July 2017 to December 2017, Trueira worked with four District Managers, and from January 2018 to early February 2018, he worked with two District Managers. (Id. ¶ 13).

32. Trueira would solicit business from the clients to which he was directed by the District Managers. (Id. ¶ 14; Tr. 32:4–8).

33. Trueira was not directly assigned a specific geographic territory. (Trueira Cert. ¶ 16). Rather. his territory was the territory of the District Managers for whom he served as an overlay. (Id. ¶¶ 15 & 16).

34. The four District Managers with whom Trueira initially worked sold Workforce Now in Northern Massachusetts, New Hampshire, Maine, and the greater Boston area. (Id. ¶ 16; see also Whittier Decl. ¶ 3).

35. While working with those District Managers, Trueira sold Comprehensive Services to two existing ADP clients in New Hampshire. (Trueira Cert. ¶ 15 & 16).

36. Trueira did not make any sales of Comprehensive Sources while working with the two District Managers in January and February 2018. (Id. ¶ 13).

37. As a Comprehensive Services Manager, Trueira met with approximately fifty clients. (*Id.* ¶ 15). The ADP clients and prospective clients that Trueira solicited were in Northern Massachusetts, New Hampshire, Maine, and the greater Boston area. (*Id.*).

38. More than 80% of the companies with whom he met were existing ADP clients. (*Id.*).

39. During the sales process for Workforce Now or Comprehensive Services, District Managers provide demonstrations of the products and sometimes provide documents with product information. (Tr. 105:17–106: 1). However, ADP does not require the potential client to sign a confidentiality agreement regarding the documents, demonstration, or pricing information. (*Id.* at 106:2–17).

40. After a company signs onto ADP and becomes a client, it is provided a sales order which incorporates a Master Service Agreement. (*Id.* at 120:15–17 & 123:6–10). That Master Service Agreement includes a section guarding ADP's confidential and proprietary information. (*Id.* at 118:18–119:17).

**Salesforce Database**

41. Trueira did not have a Salesforce database of prospective clients assigned directly to him. (Trueira Cert. ¶ 14).

42. Trueira did have access to the Salesforce database (or client list) of each of the District Managers for whom he acted as an overlay. (*Id.* ¶ 38; *see also* Tr. 32:19, 39:9–10, 65:3–4 & 93:7–10.).

43. Trueira would access these databases, generally to make a note about a meeting or discussion with a client. (Trueira Cert. ¶ 38).

44. Trueira did not have access to any type of database identifying all of ADP's clients worldwide or all of ADP's clients nationwide in one document. (Tr. 93:15–21).

45. Trueira did not have his own access to a database that identified all of ADPs clients in a specific state. but did have access to the state-specific information in his District Managers' databases. (*Id.* at 93:22–94:10).

46. Trueira sat in on feedback and roundtable discussions that were open to all of Comprehensive Services' District Managers. (*Id.* at 111:10–17).

**Pipeline**

47. During his time at Comprehensive Services, Trueira created a "pipeline," an Excel spreadsheet that tracked and documented potential sales of Comprehensive Services. (*Id.* at 33:7–10 & 38:1–3; *see also* Whittier Suppl. Decl. Ex. 1).

48. The pipeline "show[ed] what potential business may or may not be coming in." (Tr. at 33:17–18).

49. The information in the pipeline was a combination of information from the District Managers and information from Trueira. (*Id.* at 34:22–35:1).

50. Trueira provided the pipeline to his supervisor, Whittier, on a weekly or biweekly basis. (*Id.* at 33:10–11).

51. The pipeline included the following information: company name, location, contact person, the title of the contact person, "roll call," employee count, product information, information on the stage of the sales process, who referred the company, and whether the company is a prospect or a client. (*Id.* at 35:2–14; 36:5–10 & 36:21–37:12).

52. The "Roll call" column referred to the potential revenue that Trueira expected to generate from that particular client. (*Id.* at 35:15–36:4).

53. The pipeline distinguished between "a pure prospect of ADP Major Accounts or . . . a client of ADP Major Accounts." (*Id.* at 36:12–14; *see also* Trueira Dep. 66:6–14 (explaining that the list includes ADP clients that Trueira considers to be a prospect for Comprehensive Services, and prospects that may be candidates for Comprehensive Services that are not existing ADP clients)).

54. All of the companies identified as existing ADP clients on the last pipeline Trueira prepared were already on Workforce Now. (Tr. at 36:19–20, 61:10–20).

55. Two companies listed in the pipeline were identified not as existing ADP clients but as "prospects." (*Id.* at 61:13–52:3). One prospect company was not an ADP client. The other was an ADP Total Source client, but not a Workforce Now client. (*Id.* at 62:4–10).

56. The "product" column identified the particular product that Trueira and the District Manager thought they could sell to the client or prospect. (*Id.* ¶ 36:21–37:1).

57. The "product" column listings did not include WorkForce Now. (*Id.* at 92:19–23).

58. The "stages" column identified the stage of the sales process, and the "referred by" column identified the District Manager that Trueira was working with. (*Id.* at 37:2–7).

59. The pipeline also included a "month" column which was an estimate of when the business would come in for ADP, assuming ADP "won the business." (*Id.* at 37:15–18).

60. The final column of the pipeline, "notes," contained information on the next steps that were going to be taken and where Trueira and the District Manager "were in the process." (*Id.* at 37:19–25).

61. The top portion of the pipeline identified companies that Trueira was actively soliciting. (*Id.* at 86:7–11).

62. The bottom portion of the pipeline identified "leads," which were companies that Trueira and the District Manager considered to be potential clients. (*Id.* at 38:11–12).

63. Companies would appear on the "leads" list either because a meeting had been held with that company or because someone at ADP had recommended going after that account. (*Id.* at 60:17–21).

**Trueira's Training While at ADP**

64.   When Trueira began working in ADP's Total Source Division, he received formal and informal new-hire training in the Total Source product. (Tr. 58:2–11; *see also* Trueira Cert. ¶ 19). The formal training consisted of classes, while the informal training consisted of Trueira's shadowing other employees who were selling Total Source. (Tr. 58:2–11).

65.   In the Total Source Division, Trueira also had "several trainings," including a leadership development training in 2014 which was given by Total Source group. (*Id.* at 58:12–14 & 78:18–79:5).

66.   Through Blackboard Integration, a training site that ADP uses, Trueira attended thirteen or fourteen different courses while he was selling Total Source. (*Id.* at 79:9–18).

67.   Every time Trueira's role at ADP changed, he would receive training specific to the new products and services he was dealing with. (Trueira Cert. ¶ 19).

68.   When Trueira began to work in the Comprehensive Services Division, he did not receive any formal training. (Tr. 59:12–14). He recalled receiving informal training by watching videos and observing demonstrations. (*Id.* at 59:15–18).

69.   Whittier testified credibly that Trueira did have formal training "in certain aspects" of Comprehensive Services. (*Id.* at 82:11–13). She explained that she had instructed Trueira to participate in a series of trainings that the Vice President of Computer Services had set up. (*Id.* at 82:4–10).

70.   She also testified credibly that Trueira had formal training in executive conversations, "a training on gaining access at the C level and how a CFO thinks and how to be effective at basically getting them to meet with you and what was on top of their mind." (*Id.* at 82:18–20).

71.   As to WorkForce Now specifically, Trueira testified that he never received any formal training. (*Id.* at 59:19–20).

72. Trueira also acknowledged, however, that when he first began to work in Comprehensive Services, he had asked Whittier if he could attend some demonstrations of WorkForce Now, a request which she granted. (*Id.* at 31:14–21). Trueira recalled watching videos and observing live demonstrations of the WorkForce Now product. (*Id.* at 31:11–21 & 59:22–25).

73. Whittier agreed that Trueira had "on-the-job training like watching demonstrations" of WorkForce Now that were given to clients, and also observed demonstrations of WorkForce Now in the office. as per his request. (*Id.* at 82:22–83:8).

74. Whittier did not direct Trueira to get training in Comprehensive Services or in Workforce Now through the Blackboard Integration site. (*Id.* at 78:19–22).

75. Whittier believed that Trueira "gained sufficient knowledge" to be able to talk to a client about "some parts of" WorkForce Now. (*Id.* at 91:25–92:8).

76. While employed by ADP, Trueira also attended periodic, local sales trainings that all sales representatives were required to attend. (Trueira Cert. ¶ 32).

77. When a person is hired by ADP as a District Manager in its Major Accounts Division and does not have experience with Workforce Now, ADP "typically" enrolls the person in new-hire training for Workforce Now. (Tr. 76:9–17). That training includes listening to product demonstrations, shadowing different sales processes, meeting with ADP's business consultants who demonstrate the product, and engaging in discussions regarding aspects of Workforce Now. (*Id.* at 76:9–25).

**Trueira's Agreements with ADP**

    **e. Sales Representative Agreement and Non-Disclosure Agreement**

78. As a condition of employment with ADP, new sales associates enter into a Sales Representative Agreement ("SRA") and a Non-Disclosure Agreement

12

("NDA") before being exposed to ADP's confidential information. (Whittier Decl. ¶ 10).

79.   On July 12, 2012, nearly a month before his official start date, Trueira electronically accepted an SRA and NDA. (SRA; NDA; Trueira Cert. ¶ 3; Whittier Decl. ¶¶ 10 & 11).

80.   The SRA includes a non-solicitation. non-disclosure, non-use, and non-hire provision. (SRA ¶ 4). The provision provides, in relevant part

(a)     Employee agrees that during the period commencing the date Employee becomes an employee of the Company and ending one year after the date Employee ceases to be an employee of the Company for any reason whatsoever (the "Non-Solicitation Period"), Employee shall not, on Employee's behalf or on behalf of any other person, corporation, partnership or other entity whatsoever (a "Person"), directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client, bona fide prospective client or marketing partner of the Company before the date Employee ceases to be an Employee of the Company (the 'Termination Date") that (i) was located in any territory Employee managed or to which Employee was assigned or covered during the two-year period prior to the Termination Date and/or (ii) Employee was assigned, managed and/or had knowledge of, contact or involvement with during the two-year period prior to the Termination Date, to sell, license or lease any software, product or service competitive or potentially competitive with any software, product or service sold, licensed, leased, *provided or under development by the Company during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph shall only apply to clients, bona fide prospective clients or marketing partners of businesses of the Company with which the Employee was involved or exposed.*

(b)     During and after Employee's employment with the Company, Employee will not disclose to any Person any business methods, procedures, pricing and marketing structure and strategy, programs, forms, confidential information. trade secrets, the names and addresses of current clients, former clients and prospective clients of the Company. or other data and information relating to the Company, its vendors, licensors, marketing partners or clients, learned by Employee at any time during Employee's

employment with the Company (the "Information"). Upon termination of Employee's employment with the Company, Employee will return all copies of all materials which belong to the Company (whether or not such materials were prepared by the Company) and which are in Employee's possession or over which Employee exercises any control.

(c)     Employee will not, during the Non-Solicitation Period, except in the course of fulfillment of Employee's duties as an employee of the Company, use or act upon in any way, directly or indirectly, any information which became known to Employee during the course of Employee's employment with the Company concerning the identity or business activity of any current clients. former clients, prospective clients and/or marketing partners of the Company.

(*Id.*) (emphasis added). "Client" and "prospective client" are defined as "includ[ing] without limitation any entity to or for whom the Company provides or proposes to provide. as applicable, products or services either directly or indirectly, whether as a vendor, subcontractor to another vendor or otherwise, whether or not privity of contract exists between the Company and such entity." (*Id.* ¶ 4(f)).

81.    The NDA contains similar language as to non-disclosure of confidential information and trade secrets. It provides, in relevant part

During and at any time after [the employee's] employment with Automatic Data Processing. Inc. and/or any of its divisions. subsidiaries and affiliates (collectively "ADP"). [the employee] shall not, except in connection with [his or her] duties as an ADP employee, on [his or her] behalf or on behalf of any other person, corporation, partnership or other entity whatsoever (each, a "Person"), access, use, or disclose to any Person any confidential information, trade secrets, or other proprietary information of ADP, its vendors, licensors, marketing partners, business partners, or clients (including, but not limited to, (i) ADPs business methods, procedures. pricing and marketing structure and strategy, which are not publicly available and which [the employee] did not learn from a public source, (ii) ADP's source and object codes, computer screens, programs and forms, experimental or research work, methods, processes, formulas, or drawings, (iii) the names,

addresses and business activities of ADP's current, former and prospective clients, and (iv) the names, addresses, and personal information of ADP's and ADP's current, former, and prospective clients' employees), learned by [the employee] at any time during [his or her] employment with ADP (collectively, the "ADP Information").

(NDA ¶ 3(b); *see also* ¶ at 2).

82. As to post-ADP employment. the NDA also includes a non-solicitation provision. It provides, in relevant part

(b)  During the period commencing on the date [the employee] cease[s] to be an ADP employee for any reason whatsoever (such date, being the "Termination Date") and ending on the date that is twelve months thereafter, (the employee) shall not, on [his or her] behalf or on behalf of any other Person, directly or indirectly. solicit, contact, call upon, communicate with or attempt to communicate  with any Person that was a client, bona fide prospective client, marketing partner or business partner of ADP before the Termination Date to sell, market, license, lease or provide any software, product or service competitive or potentially competitive with any software, product or service sold, marketed, licensed. leased, provided or under development by ADP during the two-year period prior to [the employee's] Termination Date, provided that the -restrictions set forth in this paragraph 3(b) shall only apply to  clients, bona fide prospective clients, marketing partners or business partners of businesses of ADP with which [the employee] was involved.

(*Id.* at 3(b); *see also id.* at 3(c) (defining "client" and "prospective client" as "includ[ing], without limitation. any Person to or for whom ADP provides or proposes to provide, as applicable, products or services, either directly or indirectly, whether as a vendor, subcontractor to another vendor or otherwise. and whether or not privity of contract exists between ADP and such Person").

### f. Restrictive Covenant Agreement

83. The Restrictive Covenant Agreement ("RCA") is associated with ADP's restricted stock award program. An ADP employee must electronically accept the terms of an RCA before he or she can receive restricted stock

through ADP's restricted stock award program. (Donohue Decl. (¶ 7; Whittier Decl. ¶ 13).

84. ADP limits participation in the stock award program to certain high-performing employees. (Whittier Decl. ¶ 13). Restricted stock is offered annually to sales employees who meet their annual sales targets. (*Id.*).

85. Unlike the SRA and the NDA. which must be signed by employees before they officially begin their employment and before they have access to confidential information, RCAs are optional agreements which are provided to employees during their employment.

86. Although newly hired District Managers are provided with ADP confidential and proprietary information, they are not required to sign RCAs when they are first employed. (Tr. 112:5–17).

87. ADP's restricted stock award program was serviced through Morgan Stanley until 2014. Since 2014, it has been serviced through Fidelity. (Donohue Decl. ¶ 3).

88. Since 2014, an employee who is offered a stock award logs into a Fidelity website and must select "Restricted Stock Awards Plan." (*Id.* ¶ 8). The employee then sees a list of stock awards for which he or she is eligible. (*Id.*). To accept a stock award, the employee must select "Begin Acceptance." (*Id.*). The employee is then shown a new screen, titled "Accepting Your Grants," which identifies the number of stock grants a particular employee may accept. (*Id.*).

89. Next, the employee is provided a link to the Grant Agreement, which includes an RCA. The employee is provided a link to open and/or save the Grant Agreement. The employer must then check a box which states: "I have read and agree to the terms of the Award Agreement and the Restrictive Covenant Agreement." (*Id.* ¶ 9).

90. After checking the box, the employee has three options: l) "Accept Your Grant" to submit the stock award acceptance, 2) "Decline Grant" to decline the award, or 3) "Cancel." (*Id.* ¶ 10).

91.  If the employee selects the "'Accept Your Grant" option, acceptance of the RCA is not optional. The system is set up in a manner that requires either acceptance or rejection of the entire set of agreements associated with the award. (*Id.* ¶ 11).

92.  While Trueira worked in ADP's Total Source Division, he was awarded restricted stock on three occasions: September 3, 2013, September 2, 2014, and September 1, 2015. (Donohue Decl. ¶ 5.; Tr. 10:23–25; *see also* Donohue Suppl. Decl., Ex. 1 & 2 (Grant Acceptance documents from Morgan Stanley and Fidelity which show Trueira's Award Dates)).

93.  In February 2018, shortly after leaving ADP, Trueira was served with a letter from ADP's attorneys which attached copies of the RCAs. (Trueira Cert. ¶ 25).

94.  On February 20, 2018, counsel for ADP sent Trueira a letter that reminded Trueira of his obligations under the RCAs. (Compl. Ex. H). The letter enclosed a copy of the RCAs and stated:

   Please provide to me in writing, on or before February 28, 2018 confirmation that you will abide by your contractual obligations to ADP and that you have returned all of ADPs property. Further please include in your response the identity of your new employer, a description of your job duties, and the geographic territory for which you are responsible.

   (*Id.* at 4; *see also* 2013 RCA ¶ 7; 2014 RCA ¶ 7; 2015 RCA ¶ 8). Trueira "vaguely" recalled having received the letter. (Tr. 23:24–24:1). He also recalled reading the RCAs attached to the letter, but not in their entirety, and in particular he claimed he did not read paragraph 7. (*Id.* at 27:15).

95.  The 2013 RCA associated with Trueira's 2013 stock award was electronically accepted on September 19, 2013. (Donohue Suppl. Decl., Ex. 1).

96.  The 2014 RCA associated with Trueira's 2014 stock award indicates an acceptance date and time of September 30, 2014 at 10:40 AM Eastern Standard Time. (Donohue Decl. Ex. B at 6).

97.  The 2015 RCA associated with Trueira's 2015 stock award indicates an acceptance date and time of September 30, 2015 at 11:10 AM Eastern Standard Time. (Donohue Decl. Ex. C at 8; *see also* Donohue Suppl. Decl., Ex. 2).

98.  Trueira clearly remembers accepting the stock awards. He claims to have no memory, however, of "ever being asked to sign or to acknowledge the acceptance of a restrictive covenant as a condition of receiving the incentive stock award." (Trueira Cert. ¶ 30).

99.  Trueira also claims that he cannot recall: 1) anyone at ADP ever providing him with copies of the RCAs; 2) anyone at ADP advising him that he was bound by RCAs because he accepted an incentive stock award; 3) anyone at ADP telling him that if he accepted an incentive stock award, a condition of accepting the award was that he would have to agree to be bound to a RCA, 4) going onto a third-party portal to accept his stock awards. 5) whether the portal was from Morgan Stanley or Fidelity, and 6) whether anything on the portals stated the words "restrictive covenant." (Tr. 55:15–56:14; *see also* Trueira Cert. ¶¶ 26 & 27).

100. The Court does not find Trueira's claim to lack any memory of accepting restrictions in connection with the stock awards to be credible.

101. The 2013, 2014, and 2015 RCAs bind Trueira to substantially similar provisions. *See* 2013 RCA ¶¶ 3, 4 & 6; 2014 RCA ¶¶ 3, 4 & 6; 2015 RCA ¶¶ 3, 4 & 6).

102. The RCAs contain provisions that are not found in the SRA and NDA, including a non-compete provision, an attorneys' fee provision, and a contractual tolling provision.

103. The 2015 RCA[6] includes the following non-compete provision:

[the employee] agree[s] that during [his or her] employment and for a period of twelve (12) months from the voluntary or involuntary

---

[6]   I here quote the 2015 RCA, the most recent. The 2013 and 2014 RCAs are similar.

termination of [his or her] employment for any reason and with or without cause, [he or she] will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require [the employee] to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use or disclose ADP's Confidential Information or trade secrets. However. after [his or her] voluntary or involuntary termination of [his or her] employment for any reason and with or without cause, nothing shall prevent [the employee] from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

(2015 RCA ¶ 3) (emphasis added); *see also id.* ¶ 1(j) (defining 'Territory" as "the geographic area where [the employee) worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of [the employee's] employment with ADP"); *id.* ¶ 1(d) (defining "Competing Business"); *id.* ¶ 1(e) (defining "Confidential Information")).

104. The 2015 RCA also includes a non-solicitation and non-interference provision as to ADP's clients, business partners, and vendors. The provision related to "Clients" states:

[The employee] agrees that during [his or her] employment and for a period of twelve (12) months following the voluntary or involuntary termination of [his or her] employment for any reason and with or without cause, [the employee] will not, either on [his or her] own behalf or for any *Competing Business*, directly or indirectly, solicit, divert, appropriate, or accept any business from. or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of ADP, for any Client: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP within the one (l) year period prior to [his or her] voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; (iii) whom ADP has provided products or services in connection with the Business of

ADP and with whom ADP reasonably expects business within the two (2) year period following my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; (iv) whom ADP has solicited in connection with the Business of ADP within the two (2) year period prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; or (v) about whom [the employee] ha[s] any Confidential Information or trade secret information. [The employee] also agree[s] that [he or she] will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

(*Id.* at 4(a) (emphasis added)). A "Client" is defined as "any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, or government entity for whom ADP provided or provides products or services in connection with the Business of ADP or whom ADP has actively solicited in connection with the Business of ADP." (*Id.* ¶ 1(c); *see also id.* ¶ 1(a) (defining "Business of ADP")).

105. Additionally. the RCA contains a "Non-Disclosure and Non-Use of Confidential Information and Trade Secrets" provision. (*See id.* ¶ 6).

**Trueira's Resignation and Employment with Ultimate**

106. In late December 2017, Trueira began the interview process with Ultimate, a direct competitor of ADP. (Tr. 13:1–9, 41:6–7).

107. During the interview process, persons at Ultimate told Trueira that ADP might "come after [him] for violation of a non-compete," and put him in touch with an attorney. (*Id.* at 13–18).

108. Around the time of his departure, Trueira stated, he discussed the potential of litigation with Nicole Rafferty, a former ADP employee who now works for Ultimate, but only "vaguely." (*Id.* at 18–19).

109. Nevertheless, Trueira took no steps to find out if he had any contractual obligations not to compete or to inform ADP of the identity of his new employer. (*Id.* at 20 & 27).

110. On or about January 26. 2018, Trueira accepted a position with Ultimate. (*Id.* at 12:18–21).

111. Trueira resigned from ADP on Friday, February 9, 2018, after working for approximately seven months in ADP's Comprehensive Services division and working for ADP for a total of about five-and-a-half years. (Trueira Cert. ¶ 42).

112. Trueira represented that he returned "everything" to ADP, including handwritten notes from his time with the Total Source Division. (Tr. 70:10–16 & 106:18–20; *see also* Trueira cert. ¶ 42).

113. Trueira did not provide any ADP employees, including his supervisor, Whittier, with any information identifying his new employer, notwithstanding their direct questions about his post-ADP employment. (Tr. 11:23–12:14 & 19:19–22).

114. Trueira testified that he was unaware that he had a contractual obligation to disclose information about his new employer to ADP. (*Id.* at 20:16–19; *see also* Trueira Cert. ¶ 44). I did not find Trueira credible on this point, finding at the very least that he consciously avoided learning of the contents of the agreements.

115. Trueira began employment with Ultimate as a Strategic Development Manager on the following Monday, February 12, 2018. (Trueira Cert. ¶ 45 & 46.

116. As a Strategic District Manager, Trueira sells ULTIPRO to businesses with two hundred to five hundred employees and has been assigned to sell ULTIPRO in Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. (*Id.* ¶ 46).

117. ULTIPRO is a software platform that is a unified. bundled package of payroll and human resources information systems. (*Id.* ¶ 45).

118. Ultimate does not offer professional employer organization services to its clients. (*Id.*).

119. Ultimate's ULTIPRO software platform is directly competitive with ADP's Workforce Now software platform. (Tr. 42:9–19).

120. Trueira stated, however. that he believes Ultimate's ULTIPRO is not competitive with ADP's Comprehensive Services, the product he previously sold at ADP. (*Id.* at 67:10–12).

121. ADP's Comprehensive Services is at least generally competitive with Ultimate's "managerial services." (Whittier Suppl. Decl. ¶ 8). Trueira maintains, however, that Ultimate's managerial services are sold not by himself but by other sales representatives with whom he has no contact or relationship. (Trueira Cert. ¶ 45). I make no factual finding on the point.

122. At Ultimate, Trueira has about four hundred accounts assigned to him. (Tr. 47:7–9). Trueira estimated that approximately 40% of those accounts currently use ADP products. (*Id.* at 47:10–48:18).

123. Trueira's territory as an Ultimate employee overlaps with his former ADP territory of Northern Massachusetts, the greater Boston area, New Hampshire, and Maine except for some areas in Massachusetts, Rhode Island, and Vermont. (*Id.* at 41:15–18).

124. At the hearing, Trueira testified that if he were restricted from selling ULTIPRO in Northern Massachusetts, the greater Boston area, Maine, and New Hampshire, he could still sell ULTIPRO in other parts of Massachusetts, Rhode Island, and Vermont. (*Id.* at 43:17–21). He acknowledged that such a restriction would "drastically limit" his account base and while he could still work, he would not be able to work as "fruitfully." (*Id.* at 43:21–23).

**Trueira's Interaction with ADP Clients While at Ultimate**

125. At Ultimate. Trueira has approximately four hundred prospects in his sales force database. He estimated or guessed that approximately 10% were ADP clients in fact. (*Id.* at 47–48).

126. As an Ultimate employee, Trueira had contact with Providence Community Health ("Providence"), an ADP client in Rhode Island with about four hundred employees. (*Id.* at 45:2–19).

127. He testified that he "solicited" that entity. (*Id.*; *see also* Trueira Dep. 124:10–125:2).

128. He also acknowledged that he met a representative from Providence at an Ultimate event. When he introduced himself to all the attendees, Trueira stated that he had about six years of experience in human capital business, the majority of which was with ADP and now with Ultimate. (Tr. at 45:13–25 & 66:24–25).

129. The only further contact Trueira has had with Providence has been a phone call and e-mail. (*Id.* at 67:1–5).

130. Providence was not Trueira's client or prospective client when he was employed by ADP. (*Id.* at 46:11–13 & 67:6–9).

131. As an Ultimate employee, Trueira considers himself to be in the prospecting stage with Providence. (Trueira Depo. 128:12–14).

132. Moreover, at Ultimate, Trueira is assigned to work with SmartPak, a company that appeared under "leads" on Trueira's ADP pipeline.

133. As an Ultimate employee, he sent SmartPak an e-mail and invited it to an event. The company later declined the invitation. (Tr. at 49:12–50:8).

134. Trueira explained that he placed SmartPak under the "leads" section of his ADP pipeline because an ADP District Manager had told him that he wanted to talk to him about that account. (*Id.* at 49:23–24).

135. Trueira never personally contacted SmartPak while he was employed at ADP. (Id at 61:1–9).

136. SmartPak remains an account assigned to Trueira at Ultimate. (*Id.* at 50:12–13).

137. As an Ultimate employee, Trueira has not had any contact—aside from SmartPak—with the prospects listed on top of his ADP pipeline or the leads in the bottom of the pipeline. (*Id.* at 64:4–13).

## II. PROCEDURAL HISTORY

In light of the evidence at the hearing, the Court was persuaded that ADP had met its burden of showing that injunctive relief was warranted with respect to the SRA and the NDA, but not the RCA. I therefore granted in part and denied in part ADP's motion for a preliminary injunction. (DE 45).

On July 25, 2019, the Third Circuit vacated and remanded this Court's order for further proceedings consistent with its precedential opinion in *ADP, LLC v. Rafferty*, 923 F.3d 113 (2019). (DE 55). In *Rafferty*, the Third Circuit, applying New Jersey law, held that ADP has a legitimate business interest in imposing the RCA, the imposition of which otherwise complies with New Jersey public policy. *Id.* at 116. The court concluded that while the RCA is not *per se* unenforceable, it might place an undue hardship on employees because it is overbroad. *Id.* The Third Circuit declined to adopt the reasoning of *Laidlaw, Inc. v. Student Transportation of America, Inc.*, 20 F. Supp. 2d 727 (D.N.J. 1998), which held that a restrictive covenant tied to a stock-option award was an unenforceable restraint of trade under New Jersey law because its "primary purpose" was "to buy out potential competition." *See Rafferty*, 923 F.3d at 123 (quoting 20 F. Supp. 2d at 763). The court denied the defendants' petition for en banc review. *ADP, LLC v. Rafferty*, Nos. 18-1796 & 18-2603 (May 28, 2019).

In light of the Third Circuit's decision, ADP renewed that motion (DE 56), and on October 1, 2019 I held a hearing on the matter (DE 62). Neither party sought to introduce additional testimony.

## III. APPLICABLE STANDARDS

### A. Federal Preliminary Injunction Factors

The standards governing grant or denial of a preliminary injunction in this court are a matter of federal procedural law. "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008) (numbering added); *accord Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Because a preliminary injunction is "an extraordinary and drastic remedy," the plaintiff must establish each element by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, at 129–30 (2d ed. 1995)). Even then, a trial court's decision to issue a preliminary injunction is "an act of equitable discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

A Court will consider all four factors, but the first two are essential. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000); *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982))); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *Am. Express*, 669 F.3d at 366, 374. *But see Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Services*, 724 F.3d 377 (3d Cir. 2013) (debating whether there is a "sliding scale" of the four factors).

### B. State Substantive Law

The substantive rule of decision in this diversity case is supplied by New Jersey state law. This Court's "role in diversity cases is to apply state law as announced by the state's highest court." *LaBarre v. Bristol-Myers Squibb Co.*, 544 F. App'x 120, 125 (3d Cir. 2013) (citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010) ("A federal court under *Erie* [*R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)] is bound to follow state law as announced by the highest state court." (internal citations omitted)). "In the absence of a controlling decision by the [state] Supreme Court, we must predict how it would decide the questions of law presented in this case." *Wolfe v. Allstate Prop., & Cas. Ins. Co.*,

790 F.3d 487, 492 (3d Cir. 2015) (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45-46 (3d Cir. 2009)); *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 244 (3d Cir.2010); *New Castle County DE v. National Union Fire Ins. Co. of Pittsburgh, PA*, 243 F.3d 744, 749 (3d Cir. 2001). A federal district court in that position should consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Berrier*, 563 F.3d at 46 (quotation and citation omitted).[7]

IV.     ***RAFFERTY* AND *KUSINS***

Although I do not have the benefit of a decision on point by the New Jersey Supreme Court, I do not write on a clean slate. Many decisions, both state and federal, have interpreted the very ADP agreements at issue here. All have analyzed them in light of the so-called *Solari* factors: whether the restriction

[1] is reasonably necessary to protect [an employer's] legitimate interests,

[2] will cause no undue hardship on the defendant, and

[3] will not impair the public interest.

---

[7]     A difficult issue of interpretation arises where a Court of Appeals' prediction of state law has been undermined by subsequent state authority. Must the district court continue to follow the Court of Appeals' interpretation, or can it take later state court authority into account? Does the answer depend on whether the intervening authority is a decision of the State's highest court? *Compare In re Swinton*, 287 B.R. 634, 636 (W.D. Pa. 2003) (district court may consider intervening developments in state law), *with Itzkoff v. F & G Realty of N.J., Corp.*, 890 F. Supp. 351 (D.N.J. 1995) (district court continues to be bound by Court of Appeals ruling); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 385 (D.N.J. 2004) (citing *Itzkoff* and holding that "[t]his Court is bound by the Third Circuit's prediction of Pennsylvania law."); *Jackson v. Louisville Ladder, Inc.*, No. 11-1527, 2014 WL 460849, at *2 (M.D. Pa. Feb. 5, 2014) ("Once the United States Court of Appeals for the Third Circuit predicts how a state's highest court would resolve an issue, district courts within the circuit are bound by this prediction 'unless the state supreme court issues a contrary decision or it appears from a subsequent decision of the appellate courts that the court of appeals erred.'"), *aff'd*, 586 F. App'x 882 (3d Cir. 2014). No such issue is presented here, however.

*Solari Industries, Inc. v. Malady*, 55 N.J. 571, 576 (1970) (numbering and line breaks added for clarity).

Two recent cases in particular structure the Court's analysis: *ADP, LLC v. Rafferty*, 923 F.3d 113 (2019), and *ADP, LLC v. Kusins*, ___ N.J. Super ___, No. A-0692-17T3, 2019 WL 3367212 at *22 (App. Div. July 26, 2019). *Rafferty,* reversing a considerable body of district court case law, held that the RCA "second-tier" restrictions were enforceable, and remanded so that the district courts could apply its holding to the facts of individual cases. *Kusins,* decided after *Rafferty,* endorsed its reasoning and applied it to the facts of the cases before it, involving six departing ADP employees. The task now before me is similar to that performed by the *Kusins* court. Because *Rafferty* sets forth the applicable standard, and because *Kusins* is the highest state court decision applying that standard, it is worth discussing those two cases at some length.

## A. The Third Circuit's *Rafferty* Decision

On April 26, 2019, the Third Circuit filed a precedential opinion in *ADP, LLC v. Rafferty*, 923 F.3d 113 (2019). *Rafferty* was an appeal from other cases in this district involving the same ADP restrictive covenant agreements. There, two district courts deciding applications for preliminary injunctions had enforced the NDA and SRA but declined to enforce the RCA. The Court of Appeals reversed as to the RCA and remanded.[8] Because *Rafferty* sets forth the Third Circuit's view of the governing legal standards under New Jersey state law, I quote it at length.

*Rafferty* first laid out well-established principles of New Jersey law regarding the legitimate scope of restrictive employment covenants and the nearly universal practice of judicial "blue penciling" of such covenants to bring them within acceptable bounds:

---

[8]    I followed the lead of those earlier district court decisions and enforced the NDA and SRA while declining to enforce the RCA against Trueira before *Rafferty* was decided. After vacating and remanding those district court decisions in *Rafferty,* the Court of Appeals entered a separate order vacating and remanding my earlier decision in this case.

For more than a century, New Jersey has upheld restrictive covenants in employment agreements, *see Sternberg v. O'Brien*, 48 N.J. Eq. 370, 22 A. 348, 349–50 (1891); *Mandeville v. Harman*, 42 N.J. Eq. 185, 7 A. 37, 41 (1886), but the state initially applied an inflexible rule rendering overbroad covenants completely unenforceable, *Althen v. Vreeland*, 36 A. 479, 481 (N.J. Ch. 1897) (reasoning that a restrictive covenant "if enforced at all, it must be enforced according to its terms") . . . .

In its seminal decision in *Solari Industries, Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53 (1970), the New Jersey Supreme Court jettisoned the complete-invalidation rule, permitting the partial enforcement of restrictive covenants where consistent with public policy. *See* 264 A.2d at 61. Under its prior approach, the New Jersey Supreme Court recognized, courts struck down restrictive covenants even when "justice and equity seemed to cry out for the issuance of appropriately limited restraints." *Id.* at 60. That is, employers may "act in full good faith" only to "find that the terms of the noncompetitive agreement are later judicially viewed as unnecessarily broad." *Id.* at 56. Under these circumstances, *Solari* recognized that tailoring overbroad restrictive covenants better accorded with the parties' written agreement than wholesale invalidation. *See id.* In other instances, the complete-invalidation rule encouraged courts to fully enforce "sweeping noncompetitive agreements" where, if given a choice, "they would have cut them down to satisfy the particular needs at hand." *Id.* at 60. Under the new approach, while an employer that "extracts a deliberately unreasonable and oppressive noncompetitive covenant" should receive no benefit, courts should partially enforce an overbroad covenant as long as it is "[1] reasonably necessary to protect [an employer's] legitimate interests, [2] will cause no undue hardship on the defendant, and [3] will not impair the public interest." *Id.* at 56, 61.

Following *Solari*, New Jersey courts have strived, if possible, to salvage restrictive covenants, construing the opinion's three-part test as rarely justifying the total invalidation of a restrictive covenant. *See, e.g., Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 253 N.J. Super. 626, 602 A.2d 789, 793, 796 (App. Div. 1992) (blue penciling a restrictive covenant that had "devastating effects" on the employee and "only limited" effects on the employer to permit "substantially narrower enforcement"). As to what

business interests qualify as "legitimate," *Solari*, 264 A.2d at 61, an "employer has no legitimate interest in preventing competition as such" or simply prohibiting an employee from exercising her "general knowledge" within the industry, *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577, 581 (N.J. 1971); *see Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 542 A.2d 879, 892–93 (1988). But New Jersey courts have stressed that employers have "patently legitimate" interests in their trade secrets, confidential business information, and customer relationships. *Whitmyer Bros.*, 274 A.2d at 581; *Cmty. Hosp. Grp.*, 869 A.2d at 897. As long as the restrictive covenant reasonably protects one of these matters, the employer has adduced a "strong" business interest. *Ingersoll-Rand*, 542 A.2d at 892.

Most relevant here, in *A. T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426, 524 A.2d 412 (App. Div. 1987), the Appellate Division enforced a management consulting firm's restrictive covenant to protect its former employee's client relationships. *Id.* at 416. The restrictive covenant, the court recognized, safeguarded the "significant investment of time, effort and money" the consulting firm expended "soliciting clients and developing projects for their benefit." *Id.* A restrictive covenant protects this substantial investment in a discrete set of clients, especially for employees who maintained close, continual contact with the employer's business partners. *See id.* at 413–14, 416; *Coskey's*, 602 A.2d at 795.

If a restrictive covenant reaches beyond an employer's legitimate interests, courts applying New Jersey law have typically resorted to blue penciling to fulfill the contract's lawful ends. *See Coskey's*, 602 A.2d at 796. For instance, where a restrictive covenant covers products for which no trade secrets existed, courts have blue penciled the agreement to extricate them. *See, e.g., Raven v. A. Klein & Co. Inc.*, 195 N.J. Super. 209, 478 A.2d 1208, 1211-12 (App. Div. 1984); *see also Saccomanno v. Honeywell Int'l, Inc.*, 2010 WL 1329038 at *5 (N.J. Super. Ct. App. Div. Apr. 7, 2010) (limiting an agreement covering all "information" to just "trade secrets or confidential information"). Or, if a restrictive covenant seeks to protect client relationships, courts have narrowed the covenant to clients with which the employee interfaced. *See, e.g., Saturn Wireless Consulting, LLC v. Aversa*, No. 17-1637, 2017 WL 1538157 at *12 (D.N.J. Apr. 26, 2017).

The other two *Solari* factors—undue hardship and the public interest—likewise rarely favor the complete nullification of a restrictive covenant. The second *Solari* factor's focus on *undue* hardship lends itself to blue penciling, not complete invalidation. Seldom could an employee credibly contend that, even where an employer has proffered a legitimate business purpose, *any* enforcement of a restrictive covenant would pose an undue burden. *See Ingersoll-Rand*, 542 A.2d at 892 (a court must balance the employer's interest against the hardship inflicted). And under the "public interest" factor, New Jersey has recognized only two professions for which a client's freedom to choose or the "uniquely personal" nature of the relationship militate against enforcing any restrictive covenant. *Comprehensive Psychology Sys., P.C. v. Prince*, 375 N.J. Super. 273, 867 A.2d 1187, 1190 (App. Div. 2005) (psychologists); *see Jacob v. Norris, McLaughlin & Marcus*, 128 N.J. 10, 607 A.2d 142, 151 (1992) (attorneys); *Cmty. Hosp. Grp.*, 869 A.2d at 895 (noting that "[e]xcept for attorneys and … psychologists, our courts have consistently utilized a reasonableness test to determine the enforceability of restrictive covenants" (internal citations omitted)).

Simply put, New Jersey accepts that "non-compete agreements are a common part of commercial employment," and its *Solari* framework "recognizes that noncompete agreements can serve a useful purpose so long as the agreement is not unreasonable." *Maw*, 846 A.2d at 609. To ensure that such agreements remain reasonable, New Jersey courts do not hesitate to blue pencil a covenant but will rarely invalidate one in full. *See, e.g., Cmty. Hosp. Grp.*, 869 A.2d at 899–900.

*Rafferty,* 923 F.3d at 120–22.

 *Rafferty* accepted the parties' mutual position that the first-tier restrictions contained in the SRA and NDA, which applied to all employees, were reasonable. It then considered whether an employer could reasonably impose more onerous "second-tier" restrictions, like the RCA here, on a small group of high-performing employees.

 The departure of such high-performing employees, the Court held, may implicate especially weighty employer interests:

The preservation of client relationships and the goodwill they generate are among the business interests that New Jersey courts consistently recognize as legitimate and worthy of protection. *See Whitmyer*, 274 A.2d at 581; *A.T. Hudson & Co.*, 524 A.2d at 415. As a client services business, ADP's viability depends on its ability to attract—and retain—its clients. And by setting sales goals for its employees and identifying the subset of employees that meet or exceed those goals, ADP has the ability to empirically measure which of its employees have more extensive client contact. Employees can achieve this more extensive client contact in one of two ways—by virtue of selling to a greater number of customers or by selling more products to a smaller number of customers. Either way, post-termination competition from those employees or their solicitation of ADP's clients and Business Partners would pose a greater threat to ADP's business than would that of employees who failed to meet their sales goals and thus, necessarily, have less contact with ADP's clients. ADP therefore has a legitimate business interest in imposing the RCA on this subset of employees, and the RCA's heightened restrictive covenants, over and above those in the SRA and NDA, are reflective of the greater damage those employees could inflict on ADP upon their departure.

*Rafferty,* 923 F.3d at 123.

*Rafferty* therefore held that such second-tier restrictions served legitimate employer interests and could not be considered unreasonable *per se*. It rejected *Laidlaw, Inc. v. Student Transp. of America, Inc.*, 20 F. Supp. 2d 727 (D.N.J. 1998), which held that a second-tier restrictive covenant tied to a stock-option award was an unenforceable because its "primary purpose" was "to buy out potential competition." *See Rafferty*, 923 F.3d at 123.

Next, *Rafferty* considered the RCA in relation to the second *Solari* factor, hardship to the employee. Surveying prior cases, it noted that some had confined the RCA's non-solicitation provision to include only customers that the employee had learned of through employment at ADP, as opposed to all ADP customers. Others had confined the non-compete provision to encompass only a particular territory, or a particular market segment of customers (such as those with fewer than fifty employees). 923 F.3d at 126. While indicating that some blue penciling would be appropriate (as ADP had conceded), the

31

Court of Appeals remanded for consideration of "facts relevant to the extent of the hardship Appellees will suffer if the RCA is enforced, including whether it would preclude the employee from being able to earn a living in his or her occupation, and the fact that both Appellees voluntarily resigned from ADP and chose to immediately join Ultimate, a direct competitor, thereby arguably br[inging] any hardship upon [themselves]." *Id.* ([bracketed] material in original; internal citations and quotations omitted).

The final *Solari* factor of "harm to the public" carried no particular weight. *Rafferty* noted that this dispute occurred in an ordinary commercial context with no special public component. Thus, the first two *Solari* factors sufficed to balance the relative interests of ADP and the employees. *Id.* at 127.

On May 28, 2018, the Court of Appeals denied the defendants' petition for a panel rehearing or review en banc.

### B. The Appellate Division's *Kusins* Decision

*ADP, LLC v. Kusins*, ___ N.J. Super ___, No. A-0692-17T3, 2019 WL 3367212 (App. Div. July 26, 2019), is the highest state court decision interpreting the ADP agreements, particularly post-*Rafferty*.

"In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Downs v. U.S. Pipe & Foundry Co.*, 441 F. Supp. 2d 661, 663 (D.N.J. 2006) (quoting *Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir. 1996)). "The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise." *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996).

In *Kusins*, the Superior Court of New Jersey, Appellate Division, interpreted ADP's RCA agreements in relation to six departing employees. 2019 WL 3367212 at *22 (App. Div. July 26, 2019). All six had executed RCAs substantially similar to the one at issue here, had left ADP, and had gone to

work for competing firms, including Ultimate. 2019 WL 3367212 at *1. *Kusins* approvingly cited and followed *Rafferty*, applying its reasoning to the facts of the six cases before it. In a sense, then, *Kusins* performed the post-*Rafferty* task that is now before this Court, and in doing so pointed the way to this Court's decision.

*Kusins* first surveyed existing New Jersey case law in terms substantially similar to the *Rafferty* analysis, *supra*. It then approvingly cited the holdings of *Rafferty*:

> Earlier this year, the Third Circuit considered ADP's 2014 and 2015 RCAs, concluding that, although the covenants were overbroad, the RCAs were not unenforceable in their entirety. *ADP, LLC v. Rafferty,* 923 F.3d 113 (3d Cir. 2019). In applying the *Solari* criteria, the Third Circuit found ADP had "a legitimate business interest in imposing the RCA on [its successful salespeople], and the RCA's heightened restrictive covenants, over and above those in the SRA and NDA, are reflective of the greater damage those employees could inflict on ADP upon their departure." *Id.* at 123. We agree.

*Kusins,* 2019 WL 3367212 at *15.

Like *Rafferty, Kusins* found that the departure of certain high-performing employees posed a particularly acute threat to ADP's legitimate interest in its relations with its customers. Thus, ADP could reasonably require additional second-tier restrictions in connection with rewarding those employees' performance. *Id.* at *15–16.[9]

---

[9]    Recall that those additional restrictions, as relevant here, are as follows:

The RCA's non-compete provision provides that for a one-year period after their departure from ADP, employees may not "participate in any manner with a Competing Business" in the geographic area where the employee worked or had contact with ADP clients if working in that area would require the employee to "provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed."

The non-solicitation provision of the RCA prohibits employees—for one year after their departure from ADP—from soliciting any clients to whom ADP (1) provides; (2) has provided; or (3) reasonably expects to provide business within the two-year period following the employee's departure.

*Kusins* then turned to the counterbalancing factor of hardship to the employees—essentially, the subject of the remand in *Rafferty*. Some hardship, of course, was inevitable; the question was whether any such hardship was undue in light of ADP's legitimate interests. The non-solicitation and non-compete provisions of the RCA were found to impose an undue hardship and were therefore blue penciled in the following fashion.[10]

*Restrictions as to clients with which employee was involved.* The employees, *Kusins* noted, could hardly function at all without approaching any of ADP's 620,000 customers, prospective clients, or businesses with which ADP could expect to do business within two years. *Kusins* therefore narrowed the non-solicitation and non-compete clauses, "conclud[ing] that a non-solicitation clause and non-compete clause may prevent an employee from having any dealings with existing ADP clients that the employee was actively involved with or whose names the employee learned during his or her employment." *Id.* at *17 (citing ADP's concession regarding non-solicitation clause in *Rafferty*).

*Geographical restrictions and restrictions as to market segment.* *Kusins*, citing geographical limitations upheld in other cases, only briefly discussed the validity of the RCA's geographical limitation because parties did not dispute it. *Id.* at 17. In some of the cases under review, the trial court had "loosened the covenant's restriction by blue-penciling the geographical limitation in these clauses to also include a market segment." *Id.*

---

The RCA also prohibits employees from using or disclosing ADP's trade secrets or other confidential information.

[10]  Taking up the hint in *Rafferty*, *Kusins* rejected any claim of hardship based on termination, because the departing employees had left voluntarily:

> We also note that because defendants all voluntarily left ADP to join a direct competitor [Ultimate], they cannot assert their termination as a hardship for our consideration. *See More*, 183 N.J. at 59, 869 A.2d 884 ("If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play.").

2019 WL 3367212 at *17.

The only market-segment restriction proposed was based on the size of the customer, measured in number of employees. The *Kusins* court declined to impose such a restriction:

> We cannot discern any rationale in the record to blue-pencil a market segment component into the RCA. There is no evidence that the specialized training, information, or strategic client skills defendants obtained at ADP differed according to the number of employees in the companies they serviced. The customer relationships ADP seeks to protect are the same, regardless of how many employees the client might have.

*Id.*

*Kusins* was not quite explicit as to whether "competition," for purposes of the non-compete clause, is (like the non-solicitation clause) confined to certain actual or prospective clients of ADP. Much of the confusion arises from statements in the opinion that refer to the "RCA" generally or fail to distinguish between non-compete and non-solicitation clauses. Thus, the opinion states "that a non-solicitation clause *and non-compete clause* may prevent an employee from having any dealings with existing ADP clients that the employee was actively involved with or whose names the employee learned during his or her employment." 2019 WL 3367212 at *17 (emphasis added).[11] The

---

[11] In similar fashion, the discussion (but not the holding) of *Kusins* elsewhere appears to conflate the non-compete and non-solicitation clauses. *See, e.g.*, 2019 WL 3367212 at *8 (stating that "portions of the non-compete and non-solicitation clauses that prohibit defendants from providing services for a competitor or soliciting ADP's clients within the same territory they worked in at ADP are enforceable").

This sentence may have been intended as a shorthand reference to the combined effect of the two clauses. Nevertheless, the territorial restriction referred to is contained in the non-compete clause, not the non-solicitation clause. The *Kusins* court did not misapprehend this; deciding one of the six consolidated appeals, it clearly stated the following:

> It is of no import that the ADP clients Hopper solicited were not located in his previous geographic territory. The RCA seeks to protect existing customer relationships, and, as we have established, is enforceable. A geographic limitation is not necessary. As a result, Hopper breached the RCA in soliciting ADP's current clients and employees.

*Id.* at *19.

surrounding context of that statement, however, was a discussion of "hardship" limitations on the non-solicitation clause; I do not believe that this stray reference was intended to imply that a non-compete clause could not impose different restrictions.[12]

Here I am guided by the closing passage of the *Kusins* opinion, in which the Appellate Division definitively stated its holding:

> *In sum,* we reverse the orders granting summary judgment. We blue-pencil the RCAs to prohibit the ***direct or indirect solicitation*** of ADP's actual clients defendants had substantial dealings with while at ADP or who defendants had knowledge of during their prior employment. We also blue-pencil the clauses to prevent the ***direct or indirect solicitation*** of ADP's prospective clients that a former employee gained knowledge of during his employment at ADP.
>
> The geographical limitation ***in the non-compete clause*** is a reasonable restriction. A market segment restriction is not. Because ADP demonstrated a legitimate protectable business interest and the RCAs as blue-penciled did not impose an unreasonable hardship on defendants, the RCAs are enforceable. We are satisfied these blue-pencil modifications result in "narrowly tailored" provisions that "ensure the covenant is no broader than necessary" with respect to its duration, area, and scope of prohibited activities in order to "protect the employer's interests."

---

To be clear, I do not give effect to any dicta in *Kusins* that appear to lump the two clauses. The *Rafferty* decision, which *Kusins* was citing and interpreting, did not do so. *See Rafferty,* 923 F.3d at 126 (noting cases that had restricted the non-solicitation clause to ADP customers, or restricted the non-compete clause to a geographic area or market share). And indeed, the *Kusins* case's definitive statement of its holding, quoted at page 36, *infra,* did not contain any such imprecision. *See id.* at *21.

[12]     The more restrictive interpretation is also in some tension with the fundamental rationale of *Rafferty*: that ADP was entitled, in exchange for additional consideration, to impose additional and further restrictions on high-performing employees. To limit the RCA's non-compete clause in this manner would render it not quite, but nearly, superfluous; the SRA, in particular, already prohibits all ex-employees from having actual or attempted contact or communication of any kind with "clients, bona fide prospective clients or marketing partners of businesses of the Company with which the Employee was involved or exposed." (SRA ¶ 4, quoted above)

*Id.* at *21 (***emphasis*** added) (quoting *Cmty. Hosp.*, 183 N.J. at 58–59).

This, in my view, constitutes a clear statement that the non-solicitation clause is limited to certain actual and prospective ADP clients, without respect to geography; the non-compete clause, on the other hand, encompasses a broader class of customers but is limited geographically. Both, of course, are temporally limited to a term of one year.

## V.    APPLICATION OF PRELIMINARY INJUNCTION FACTORS

### 1. Likelihood of Success on the Merits

On a motion for a preliminary injunction, ADP must demonstrate a likelihood of success on the merits. *See SK & F. Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980). That standard requires "a reasonable probability, [but] not the certainty, of success on the merits." *Id.*

When this motion was first before the Court, Trueira argued that ADP was unlikely to succeed on the merits because 1) ADP is barred from enforcing the RCAs by the doctrine of issue preclusion; 2) the RCAs are unenforceable restraints on trade; and 3) in the alternative, ADP fails to establish breach or likely breach of any enforceable provisions of the RCAs. I concluded that issue preclusion would likely not bar ADP's complaint, *ADP, LLC v. Trueira*, No. 18-3666, 2018 WL 3756951, at *19 (D.N.J. Aug. 8, 2018). At any rate, I am now directly bound by the Third Circuit's decision that the RCA is not unenforceable *per se. See Rafferty*, 923 F.3d at 116. Thus, the only issues now before the Court are the permissible scope of the RCA on the facts of this case, and whether ADP is likely to prevail in showing that Trueira violated it.

### a. Legitimate Business Interest

Preservation of client relationships is a legitimate business interest that is worthy of protection. *See Whitmyer*, 58 N.J. at 33; *A.T. Hudson & Co.*, 82 N.J. Super. at 508. ADP depends on its ability to attract and retain clients. Both *Rafferty* and *Kusins* have identified ADP's "legitimate and protectable interest in its customer relationships sufficient to justify enforcement of its RCA." *Kusins*, 2019 WL 3367212, at *16.

By setting goals for its employees and identifying those who meet them, ADP can identify the employee-sources of the greatest client contact. To increase client contact, an employee can either (1) sell to a greater number of customers or (2) sell more products to an existing customer base. Either represents an increase in revenue if the employee is selling on behalf of ADP, and either represents a decrease in revenue if the employee is selling on behalf of a competitor. Thus, under *Rafferty,* ADP has a legitimate business interest in imposing the RCA restrictions on its best-performing employees, who have been commensurately rewarded with a stock bonus. The increased burden of the RCA reflects the greater danger those employees pose if they were to leave ADP for a competitor.

Here, Trueira has accepted with Ultimate a position that carries responsibilities similar to those he discharged at ADP. He carries out those responsibilities by selling substantially similar products and services. Finally, he does so in some of the same territories he worked in while at ADP.

It is difficult to imagine that Trueira would *not* gain an advantage over ADP by virtue of having been privy to its customer relationships and confidential information. The resulting diversion of business from ADP, whether inadvertent or intentional, would necessarily harm the firm. With the benefit of the intervening authority of *Kusins* and *Rafferty,* I find that ADP's imposition of the RCA to limit the damage arising from turnover of some of its most effective employees and protect its confidential information, is a reasonable means of furthering a legitimate business purpose.

### b.        Tailoring and Burden

As to the burden and tailoring of the scope of the ADP Agreements, the parties' arguments were more developed in the companion case of *ADP v. Pittman.* The reader may wish to consult my opinion and order in that case, Civ. No. 19-16237 (anticipated to be filed as DE 25 & 26), filed simultaneously herewith.

Under New Jersey's *Solari* test, even where a covenant serves legitimate business interests, "it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity" so that those interests are not outweighed by the hardship the covenant inflicts on the employee. *Coskey's*, 235 N.J. Super at 635 (citations omitted). To determine the degree, if any, to which the RCA must be blue penciled, the Court must "balance the employer's need for protection and the hardship on the employee that may result." *Ingersoll-Rand*, 110 N.J. at 635. To enforce the RCA would impose some burden on former ADP employees who move laterally into positions with competing firms. "The question remains, however, whether this hardship [is] 'undue,' when balanced against the legitimate interest of the employer." *Coskey's*, 235 N.J. Super at 636.

To review, *Kusins* held that, after blue-penciling, the non-solicitation and non-compete clauses would prohibit the following:

> The direct or indirect solicitation of ADP's actual clients which defendants had substantial dealings with, or knowledge of, while at ADP.

> The direct or indirect solicitation of ADP's prospective clients that a former employee gained knowledge of during his or her employment at ADP.

> Competition with ADP within the geographical limits of the non-compete clause, not confined to any market segment.

2019 WL 3367212, at *21. *See* discussion of *Kusins* at Section IV.B, *supra*.

I defer to *Kusins*, an on-point decision of the State's intermediate appellate court, because it is the most authoritative indicator of how the New Jersey Supreme Court would view the ADP agreements. *See, e.g., U.S. Underwriters Ins. Co.*, 80 F.3d at 93. With minor reservations, noted above, I agree with *Kusins*'s implementation and application of the holdings of *Rafferty*.

During his time at ADP, Trueira operated in Maine, Northern Massachusetts, New Hampshire, and the greater Boston area. More than 80% of the companies with whom he dealt were already ADP clients. His market-

segment focus was on employers of twenty-five to seventy-five employees. Now, with Ultimate, Trueira sells products and services to businesses with 200–500 employees in Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. Those products and services directly compete with those provided by ADP. At Ultimate, Trueira has about four hundred accounts assigned to him, and he estimates that approximately 40% of those accounts currently use ADP products. He also has approximately four hundred prospects in his sales force database and estimates that approximately 10% of those were ADP clients.[13]

The scope of the RCA is reasonably tailored to protect ADP's interest, while ensuring Trueira's ability to ply his trade. Although ADP's business is international, the non-compete provision is limited to the geographic territory in which Trueira worked while at ADP. Trueira has many opportunities to work for a competitor outside his ADP territory, and his obligations to ADP do not unduly restrict him from maintaining his livelihood in the same profession. Indeed, Trueira's territory at Ultimate does not entirely overlap with the area he covered while at ADP; he may continue to operate in that non-overlapping area if he does not otherwise violate the RCA. Accordingly, the language of the restrictive covenants and the resulting and requested prohibition are reasonable and enforceable against Trueira. The evidence suggests that after blue penciling the RCA in the manner suggested by the Appellate Division, this *Solari* factor favors ADP's position.

---

[13]    In my earlier opinion, I dealt only with violations of the SRA and NDA, as I declined to enforce the RCA. Thus it was more significant then than now that at Ultimate, Trueira is specifically assigned to work with SmartPak, a company that appeared as a lead on his ADP prospect pipeline. With respect to the non-solicitation clause, the evidence showed that since resigning from ADP, Trueira has contacted at least one ADP client to which he was exposed or with whom he was involved while at ADP. That violation, as I pointed out, was not so blatant or severe, but was significant in that Trueira had adopted the position—erroneous, even then—that he had the right to contact any entity that was not his own direct client at ADP. Such concerns are pushed more into the background by the more far-reaching restrictions of the RCA— *e.g.,* the noncompete clause.

### c. **Public Interest**

The final *Solari* factor instructs courts to consider the fact that "enforcement of the restriction should not cause harm to the public." *Cmty. Hosp.*, 183 N.J. at 60 (citing *Karlin*, 77 N.J. at 424). Like the ADP cases reviewed in *Rafferty*, this case contains "no major public component." The imposition of restrictive covenants here creates no injury, for example, to "the rights of the public to have free access to the advice of professionals licensed by the State," as it may do in the context of physicians and accountants. *Coskey's*, 253 N.J. Super. at 634. Like *Rafferty*, I find the public interests here to be generic and equivocal.

*     *     *

I therefore find that ADP has a likelihood of success in its attempt to enforce the RCA, as blue-penciled by the Court here. Trueira is violating the RCA into which he entered with ADP. He has taken a position with one of ADP's direct competitors, a position in which he sells competing products in the relevant geographic area. At least to some limited extent, he has violated the non-solicitation clause as well. ADP has demanded his compliance with the obligations into which he and it entered and has, moreover, gained the benefit of recent case law that recognizes its legitimate business interest in enforcing the agreement. Nonetheless, Trueira has remained in his position at Ultimate and has indicated no willingness to conform his behavior to accord with the agreement. ADP has shown a likelihood of success on the merits.

### 2.   **Irreparable Harm**

Harm is considered "irreparable" if it is not redressable by money damages later, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1964)). ADP has the burden of proving a "clear showing of immediate irreparable harm" absent injunctive relief. *ECRI v. McGraw-Hill Inc.*, 809 F.2d 223, 225 (3d Cir. 1987); *see also Winter*, 555 U.S. at 21 (holding it

was error to water down the irreparable harm requirement from "likelihood" to "possibility." even where likelihood of success was strong).

ADP argues that the irreparable harm it will suffer is the loss of existing and prospective clients, employees, marketing partners, confidential and proprietary information, and customer goodwill. Courts in the Third Circuit and this District have repeatedly recognized that the loss of business opportunities and goodwill constitutes irreparable harm. Likewise. New Jersey courts recognize that "the diversion of a company's customers may. . . constitute irreparable harm . . . . [T]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages." *Fluoramics, Inc. v. Trueba*, No. 408-05, 2005 WL 3455185, at *8 (N.J. Super. Ct. Ch. Div. Dec. 16, 2005) (citation omitted). Improper use of trade secrets constitutes irreparable harm. *See U.S. Food Serv., Inc. v. Raad*, 2006 WL 1029653, at *6 (N.J. Super. Ch. Div. Apr. 12, 2006) at *7 ("Damages will not be an adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss.").

At a minimum, there is overlap between ADP and Ultimate's lines of business. UltiPro and WorkForce Now are similar products; Ultimate is a direct competitor of ADP; and Trueira works in his former ADP territory. Together these facts indicate that ADP has made a clear showing that Trueira's behavior establishes a strong likelihood of irreparable harm to ADP that is independent of a mere desire to stifle competition. Such harm consists of potential misuse of confidential information, loss of business opportunities, and impairment of business goodwill. ADP has demonstrated that its injuries cannot be redressed post hoc by money damages. The "irreparable harm" prong therefore favors a preliminary injunction.

### 3, 4. Balancing the Equities and the Public Interest

The final two prongs, balancing of the harms and the interest of the public, require little additional discussion. They weigh in favor of granting injunctive relief.

No doubt enforcement of the RCA will cause Trueira some countervailing hardship. But that alleged hardship—requiring him to adhere to the RCA—is neither precisely established nor unduly burdensome. For now, he may not compete with ADP in one area of geographic overlap. He may not solicit ADP's actual or prospective clients with whom he had substantial dealings, or of whom he learned, while at ADP. He may continue to do everything short of that (provided that his conduct does not otherwise violate the RCA). After the relevant period has passed, Trueira may continue working for Ultimate in the fullest capacity. He may not disclose or exploit confidential information. The opportunities open to Trueira remain substantial.

The public interest, for the reasons stated above, is a neutral factor.

Balancing the four relevant factors, I find that a preliminary injunction is well justified.

## VI.   DURATION

The RCA contains a tolling provision, essentially intended to ensure that the ex-employee, while contesting the RCA's enforceability in court, does not run out the clock on its one-year duration:

> 12. Tolling. The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

(DE 1-1, Ex. E ¶ 12).

Mr. Trueira left his employment at ADP on February 9, 2018. In my prior opinion, dated August 2, 2018 (DE 44; public redacted version at DE 48), I

found that that he had been in violation of the SRA and NDA, though not egregiously so, and I considered—erroneously, as it turns out—that ADP had overreached in attempting to enforce the RDA. (*See* DE 48 at 44–45) As a result, I made an equitable determination that the restrictions of the SRA and NDA should run for eight months from the date of my order. That period expired over seven months ago, on March 2, 2019.

The tolling provision, no less than the other provisions of the employment covenants, is subject to the court's equitable powers and the principles of *Solari*. Trueira has functioned under the SRA and NDA, and since August 2018 has enjoyed the assurance of this Court and many other cases that the RCA did not bind him.

To wholly restart the one-year clock on the RCA, I find, would not be equitable under the vary particular and special circumstances of this case. ADP has already received not all but some of what it bargained for. In addition, pursuant to this Court's prior order, the period of restriction expired in March 2019. Trueira, unlike a newly-departed employee, will be forced to retrench—not merely to refrain from taking on certain business, but pulling back from business in which he is already engaged with this Court's imprimatur.

To reflect that greater hardship, I will limit the effect of the tolling provision. This injunction will expire four months from the date it is entered.

## VII. CONCLUSION

For the foregoing reasons, ADP's motion for a preliminary injunction is **GRANTED**. Pursuant to the terms of the RCA, Trueira shall be restrained, for a period of four months from the date of entry of the preliminary injunction granted herein.

An appropriate Order granting ADP's motion follows. Within seven days. the parties shall submit an agreed form of preliminary injunction, which shall specify the relief granted to implement the above rulings, and shall include the amount of bond, which shall be posted within 15 days. See Fed. R. Civ. P. 65(c) (providing that this Court "may issue a preliminary injunction ... only if the

movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined").

Dated: October 18, 2019

Hon. Kevin McNulty
United States District Judge